1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                    CENTRAL DIVISION AT LEXINGTON
                               - - -
 3
     UNITED STATES OF AMERICA,      : Docket No. 23-9
 4                                  :
                       Plaintiff,   : Lexington, Kentucky
 5                                  : Thursday, February 27, 2025
                                    : 3:00 p.m.
 6   v.                             :
                                    :
 7   JOSE ALZADON, MICHAEL          :
     BREGENZER, BARBIE VANHOOSE,    :
 8                                  :
                       Defendants.
 9
                               - - -
10             TRANSCRIPT OF PRETRIAL CONFERENCE
               BEFORE KAREN K. CALDWELL
11             UNITED STATES DISTRICT COURT JUDGE
                               - - -
12
     APPEARANCES:
13
     For the United States:      DERMOT WILLIAM LYNCH, ESQ.
14                               SARAH ELIZABETH EDWARDS, ESQ.
                                 ABDUS SAMAD PARDESI, ESQ.
15                               U.S. Department of Justice
                                 1400 New York Avenue, N.W.
16                               Washington, D.C.  20005

17   For the Defendant,         NOAH ROBERT FRIEND, ESQ.
     José Alzadon, M.D.:        Noah R. Friend Law Firm, PLLC
18                              Post Office Box 310
                               London, Kentucky  40741
19
     For the Defendant,         RONALD W. CHAPMAN, ESQ.
20   Michael Bregenzer:         Chapman Law Group
                               1441 West Long Lake
21                              Suite 310
                               Troy, Michigan  48098
22
     For the Defendant,         MICHAEL J. CURTIS, ESQ.
23   Barbie Vanhoose:           Curtis Legal Services
                               1455 Winchester Avenue
24                              Suite 708
                               Ashland, Kentucky 41105
25
```

2

1    APPEARANCES (Continued)

2    Court Reporter:                    LAUREN I. GOOTEE, RMR, CRR
                                        Official Court Reporter
3                                       101 Barr Street
                                        Lexington, Kentucky 40507
4                                       (859) 469-7459

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        Proceedings recorded by mechanical stenography,
     transcript produced by computer.

25

3

1          (Proceedings commenced in open court at 3:10 p.m.)

2          THE COURT:  Would the clerk please call the matter to

3     come before the Court.

4          COURTROOM DEPUTY:  Yes, Your Honor.

5      Lexington Criminal Action Number 23-9, United States of

6     America versus José Alzadon, et al., called for pretrial

7     conference.

8          THE COURT:  Would the United States make its

9     appearance for the record.

10         MR. LYNCH:  Yes, Your Honor.  Dermot Lynch for the

11    United States.  And with me are -- I'll let them introduce

12    themselves.

13         MR. PARDESI:  Good afternoon, Your Honor.  Samad

14    Pardesi on behalf of the United States.

15         MS. EDWARDS:  Good afternoon, Your Honor.  Sarah

16    Edwards.  Pleasure to meet you.

17         THE COURT:  Thank you.  Welcome, counsel.

18         MR. LYNCH:  Thank you, Your Honor.

19         THE COURT:  Counsel for José Alzadon.

20         MR. FRIEND:  Good afternoon, Your Honor.  Noah Friend

21    on behalf of Dr. Alzadon, who is seated behind me.

22         THE COURT:  Mr. Friend.  Dr. Alzadon.

23      Counsel for Michael -- is it Bregenzer?

24         DEFENDANT BREGENZER:  Yes, Your Honor.

25         THE COURT:  Okay.

1          MR. CHAPMAN:  Good afternoon, Your Honor.  Ronald
2   Chapman on behalf of Mr. Bregenzer, who is seated behind me to
3   my left.
4          THE COURT:  Mr. Bregenzer.  Mr. Chapman.
5          Counsel for Barbie Vanhoose.
6          MR. CURTIS:  Good afternoon, Your Honor.  Mike Curtis
7   here with Barbie Vanhoose.
8          THE COURT:  Mr. Curtis.  Ms. Vanhoose.
9      Thank you all for being here this afternoon.  I hope that
10  this will move us toward a more productive and efficient trial
11  process.
12      Before we begin, I'll announce that we are going to be
13  proceeding upstairs in Courtroom A.  That should give you all
14  more room to spread around.  Judge Reeves was very gracious to
15  allow us to do that.
16      I will tell you that the acoustics up there are a little
17  bit different and things we'll talk about later.  You've got
18  to stay behind the microphone to be heard.  So if I get after
19  you for stepping away from the podium, it's not because I'm
20  stuck on meaningless rules, it's because you really can't
21  hear.  There are total dead spots up there.  So kind of keep
22  that in mind during the course of your trial preparation.
23      I'd like to begin today by addressing matters that have
24  been raised by the parties that remain contested.  Let's get
25  those out of the way, and then we'll talk about the schedule

5

1    and some of the manner in which we will proceed with this

2    case.

3        The first matter I'd like to take up is the government's

4    omnibus motion, Docket Entry 127.  I'm not going to discuss

5    those matters to which there are no objections or exceptions.

6        So the first thing I'd like to take up is Bregenzer and

7    Vanhoose's objection to the proposed evidence regarding

8    Alzadon's disciplinary history.  Now, Alzadon does not object.

9    However, Bregenzer and Vanhoose object to the disciplinary

10   issues that allegedly arose at the Irvington Hospital.

11       I have read the parties' papers.

12       Does anybody want to speak further to what I will refer

13   to as the Irvington matter?

14       Mr. Friend?

15       MR. FRIEND:  Your Honor, if I may.  We obtained some

16   additional disclosures, I think, from the anticipated witness

17   that will actually be testifying on that.  So, again, at this

18   point Dr. Alzadon is totally willing to allow that evidence

19   in, doesn't have any objection, especially based on the recent

20   information that was turned over by the government.

21       MR. LYNCH:  Your Honor, just on that point.

22       THE COURT:  Yes?

23       MR. LYNCH:  I don't believe -- I think we have also a

24   902(11) cert from the KBML.  We weren't actually anticipating

25   calling that witness.  I want to just correct for the record

6

1     that we want to try to streamline and have fewer witnesses.  I

2     just want to make sure that Mr. Friend has that information.

3           THE COURT:  Very well.

4         You know, at Irvington, Alzadon was disciplined for

5     performing surgeries that were assigned to others.  I'm going

6     to sustain Bregenzer and Vanhoose's objection to that.  I find

7     that it was remote in time and that it only kind of has

8     moderate relevancy under 404(b).  It occurred, I think, 25

9     years ago.  So I'm going to sustain objection to the Irvington

10    disciplinary records.

11        I also find that it's not really necessary in view of the

12    disciplinary records at the Highlands Hospital, which the

13    Court finds is relevant both as intrinsic and 404(b) evidence.

14    And I'm going to note that, again, Alzadon does not object to

15    that, that only Vanhoose and Bregenzer do.

16        The Court finds that that evidence is really necessary to

17    show the cause of Alzadon's alleged subterfuge.  It's directly

18    relevant to completing the story and providing background and

19    context.  Also, clearly under 404(b) it would show motive,

20    intent, and absence of mistake.  So that objection will be

21    overruled.

22        Now, I am going to limit the amount of evidence that the

23    government may admit with respect to this particular

24    disciplinary thing, and I think probably the government may

25    intend to do this.  Again, this is going to be a long trial,

1       and I fear that the jury may convict counsel if we take too

2       long to try this case.

3           So I am going to limit the proof that the discipline did

4       occur, that the defendant was disciplined.  I'm not sure the

5       reason why is relevant, because as a result of the discipline,

6       Alzadon lost his license to practice surgery, that's

7       admissible; and C, this was the reason or one of the reasons

8       that WellCare denied his ability to bill WellCare.  That seems

9       to me to be sufficient.  We don't need to get into the

10      particulars of the discipline.  That creates sort of a side

11      trial.

12          Can the government work with that, counsel?

13              MR. LYNCH:  Yeah.  I think -- if we're going to limit

14      it to that, Your Honor, hopefully we can work on a

15      stipulation.  We have a case agent witness I think we can

16      probably --

17              THE COURT:  All right.  I thought a stipulation might

18      be the most effective.  That way that eliminates the need for

19      another witness.

20          Do you think you can work on that, Mr. Friend?

21              MR. FRIEND:  Yes, Your Honor, we're glad to do a

22      stipulation.

23              THE COURT:  All right.

24          Now, what about Mr. Bregenzer?

25              MR. CHAPMAN:  Your Honor, I would ask that, given the

1     Court's ruling, may we have a limiting instruction preventing

2     any spillover information from attacking Mr. Bregenzer in his

3     case?

4         My concern is that if they believe that he was aware of

5     this information and still hired Dr. Alzadon, understanding

6     that you're not going to get into the reason, that that would

7     potentially be used by the jury for an improper purpose.

8          THE COURT:  Well, don't you think Mr. Bregenzer's

9     knowledge of the fact that he had a surgeon who had been

10    disciplined is relevant to the jury understanding the case

11    against him?  Whether he knew or not.  I don't know if he

12    knew.

13         MR. CHAPMAN:  He still had a valid DEA registration

14    and a valid license to practice medicine.  And as far as

15    Kentucky is concerned, that's sufficient for him to practice.

16    And I believe the credentialing matters came up after as well,

17    after that decision.

18         THE COURT:  All right.  What says the United States?

19         MR. LYNCH:  Your Honor, you sort of, I think,

20    endorsed the intrinsic evidence theory as well as 404(b)

21    theory.  So I think if it's intrinsic evidence, there's no

22    need for a limiting instruction.  And I think that Bregenzer's

23    knowledge of Dr. Alzadon's limitations is relevant to

24    Bregenzer's culpability in the case.

25         THE COURT:  All right.

1          Mr. Curtis, does Ms. Vanhoose have a dog in this fight?

2              MR. CURTIS:  No dog.

3              THE COURT:  All right.  Thank you.

4          I'm going to overrule Mr. Bregenzer's request for a

5     limiting instruction.  I think this is something you can

6     handle in cross-examination and in argument.

7          I also have here that with respect to the government's

8     omnibus notice or motion, whatever you would call it, that

9     Bregenzer and Vanhoose object to evidence that Alzadon made

10    false statements on his Medicare enrollment form.  I want to

11    be sure that I understood that.

12         If you want to speak to that, Mr. Chapman.

13         Are you contesting that he in fact made those false

14    statements?

15             MR. CHAPMAN:  No, Your Honor, just contesting any of

16    that evidence to be used against my client for the purposes of

17    proving the government's case-in-chief; namely, the health

18    care fraud charges.

19             THE COURT:  All right.

20         Mr. Curtis, you have an objection to that as well?

21             MR. CURTIS:  Judge, I do object to that for the

22    simple reason, she would have no knowledge of whether or not

23    he made a false statement or not because she wasn't privy when

24    he did the acts.

25             THE COURT:  All right.

1          MR. CURTIS:  And, I mean, she's not a medical doctor

2     either.

3          THE COURT:  Okay.  Very well.

4        What says the United States?

5          MR. LYNCH:  Your Honor, I think we should just see

6     how the proof comes in.  I think that, you know, for example,

7     Mr. Bregenzer was sort of aware generally, I think, of the

8     number of credentialing issues.  I think if counsel wants to

9     test the limits of his knowledge or whether or not he knew

10    about what was happening with the Medicare credentialing, that

11    can also be handled in cross.

12         THE COURT:  All right.  I am not going to exclude the

13    evidence at this point.  I think that it did happen, there's a

14    false statement.

15       Mr. Chapman, I didn't see you.

16         MR. CHAPMAN:  And I'm sorry.  With all due respect to

17    the Court's ruling, I just want to add one additional piece of

18    information I was reminded of by my client.

19       That application was in 2016, which I think does change

20    the analysis quite a bit as to whether or not my client would

21    be responsible for any statements made on that application.

22         THE COURT:  I don't think your client is responsible

23    for any statements made on the application.  I don't think

24    that's the theory.  The theory is that he knew about

25    credentialing issues, he knew about insurance issues.  That

1    might go to his knowledge or motive.

2        Have I stated that correctly, counsel for the United

3    States, Mr. Lynch?

4        MR. LYNCH:  Yes, Your Honor.  I mean, I do think, in

5    fairness, this is mainly an issue with defendant Alzadon.  But

6    I do think that -- depending on how the proof comes in, I

7    think that credentialing matters could be germane.

8        THE COURT:  I'm not going to preclude the evidence,

9    and I think you can all handle it on cross and direct.  And,

10   again, it's clear that this is primarily against Dr. Alzadon.

11   But I think that it is clearly intrinsic and both 404(b)

12   evidence, and I'm not going to give a limiting instruction at

13   this point.

14       Okay.  The government seeks to preclude introduction of

15   changes in the prescription caps that took place after the

16   period of the conspiracy in this case.  In other words, there

17   was a limited amount of Suboxone that could be prescribed, and

18   those caps were taken off later after the period of

19   conspiracy.  I think Alzadon seeks to admit the

20   post-conspiratol changes.

21       Do you want to talk about that, Mr. Friend?

22       MR. FRIEND:  Your Honor, nothing particularly beyond,

23   I think, what we have in the briefing on that.

24       THE COURT:  All right.

25       Well, the Court finds that this is irrelevant and

1    actually could serve to confuse the jury.  Subsequent changes

2    to the law or regulations shed no light on the defendant's

3    action during the course of the conspiracy.  The Court will

4    limit the evidence to the time and place of the alleged

5    conspiracy.

6        Let's now move to issues regarding Barbie Vanhoose's

7    confession contained in law enforcement statements.

8        Now, in the written papers, I didn't see objections from

9    Alzadon or from Mr. Bregenzer in this area.  Have I read that

10    correctly?

11        Mr. Friend?

12        MR. FRIEND:  That is correct, Your Honor.  We've

13    prepared a waiver form also that we'll get filed in the

14    record.

15        THE COURT:  Very well.

16        Is that correct, Mr. Chapman?

17        MR. CHAPMAN:  Yes.

18        THE COURT:  And is your client also willing to find a

19    waiver on the proffered or Sixth Amendment issues?

20        MR. CHAPMAN:  Of the introduction of it, Your Honor?

21        THE COURT:  Yes.

22        MR. CHAPMAN:  May I give that some more thought and

23    file something with the Court?

24        THE COURT:  Yeah.  I mean, because if you're not

25    going to object to it and it's going to come in, then I don't

1    know -- actually, I think the government agreed to redact the

2    portions that were applicable to Mr. Bregenzer.

3        Do you want to speak to that, counsel?

4        MS. EDWARDS:  Yes.  So there are four excerpts of

5    Ms. Vanhoose's interview that we plan to introduce, and after

6    discussion with Mr. Bregenzer's counsel, we did shorten two of

7    the clips to eliminate some references to him, and I had

8    understood that we had reached agreement at that point.

9        MR. CHAPMAN:  And that's correct, Your Honor.  I want

10   to review the clips as they intend to be presented.  I know

11   the government has made some changes to the exhibits.  I just

12   want an opportunity to review before we settle that matter.

13       THE COURT:  Okay.  I'll need to know on Monday

14   morning if you can do that.

15       MR. CHAPMAN:  Absolutely, Your Honor.

16       THE COURT:  Because if there is an issue on

17   confrontation, I want to resolve that pretrial.

18       I think they've resolved the issue on confrontation, but

19   I want to be sure.

20       MS. EDWARDS:  Just so that you're aware, we didn't

21   change the content from the filing in January, we just

22   provided the synced transcripts for you-all to be able to

23   review.

24       MR. CHAPMAN:  As soon as I review those, Your Honor,

25   I will.

1          There is the matter of completeness.  We may, depending

2     on how the evidence comes in, want additional portions in, and

3     that's something that we'd like to discuss with the government

4     as well.

5               THE COURT:  Well, very well, but you can't use this

6     as a shield and a sword.  Do you understand that?

7               MR. CHAPMAN:  I understand, Your Honor.

8               THE COURT:  Okay.  Very well.

9          I think that takes care of all of the issues related to

10    the government's omnibus motion at 127 that have not either

11    been agreed to or that I haven't ruled on.

12         Anybody have anything else that I would have missed?

13              MR. LYNCH:  We think that's correct, Your Honor.

14              THE COURT:  All right, then.  Let's move now to the

15    defendants' motions.

16         We have Docket Entry 131, and Mr. Bregenzer asked the

17    Court to preclude evidence that mental health counselors

18    up-coded patients' visits.

19         Do I understand your motion correctly, Mr. Chapman?

20              MR. CHAPMAN:  That's correct, Your Honor.

21              THE COURT:  Do you want to help me out on that one a

22    little bit?

23              MR. CHAPMAN:  Well, the indictment appears to be

24    relatively specific to the use of the identity of Doctor-1 to

25    bill a certain way and to bill for services that were not

1    rendered.  It appears through some of the discovery, including

2    exhibits that the government has now provided, that they

3    intend to pursue a theory that there was up-coding for mental

4    health treatment and that there was pressure to bill more

5    mental health treatment than perhaps what patients needed.

6         That is a new separate theory of health care fraud not

7    included in the indictment.  And given that there's no

8    allegations that these services were somehow not rendered, it

9    seems to be outside of the limitations of the indictment with

10   respect to conduct.

11        The defense simply did not prepare the case over the last

12   year or so to defend the specific mental health treatment

13   allegations given the limited information in the indictment

14   and the theories that the government identified to the grand

15   jury.  I would say that there would be a danger of a

16   substantial variance created should the government explore

17   this territory as well as a few other themes the government

18   seems to be developing.

19        And I have to say, it does appear to be a significant

20   pivot from the government's theories raised during their

21   investigation likely to the grand jury and in the indictment,

22   Your Honor.

23             THE COURT:  Now, isn't this coming from the

24   conspiracy count?

25             MR. CHAPMAN:  Conspiracy to commit health care fraud

1 | counts, Your Honor?

2 | THE COURT:  Yes.

3 | MR. CHAPMAN:  It may very well be, but it appears

4 | that the limitations in the indictment there are -- and I can

5 | go back to the expressed wording in the indictment -- not so

6 | broad as to call into question every service that KAC

7 | performed in any location.  But it does appear that the

8 | government is preparing their case to take issue with nearly

9 | every service that KAC performed in many different locations.

10 | THE COURT:  Thank you.

11 | Who will speak to that?

12 | MR. PARDESI:  Yes, Your Honor.

13 | THE COURT:  Mr. Pardesi?

14 | MR. PARDESI:  Yes, Your Honor.

15 | THE COURT:  I'm notorious for mispronouncing names,

16 | so you all are just going to have to get used to it.

17 | MR. PARDESI:  I appreciate that, Your Honor.

18 | So Your Honor hit the nail on the head.  This is from

19 | paragraph 35 of the superseding indictment which sits under

20 | the Count 1 conspiracy to commit health care fraud.  And, I

21 | mean, we tried to be clear in saying "including but not

22 | limited to" in terms of the various forms that the health care

23 | fraud conspiracy took.  We are very clear about up-coding and

24 | said that it was included but not limited to.

25 | And we've given counsel ample discovery that has talked

1    about up-coding in various forms, not just the 99212 to 99214,

2    not just in the smoking cessation counseling, but in the

3    variety of services that they were providing and billing to

4    Medicare and Medicaid.

5                THE COURT:  It seems that this is a billing case and

6    about parties that were part of the conspiracy causing

7    up-coding, up-billing, conspiring in other words to engage in

8    activities to defraud the payors.

9         Accordingly, I will deny Bregenzer's motion to include

10   evidence of the up-coding.

11               MR. PARDESI:  Thank you, Your Honor.

12               THE COURT:  All right.  Let's look at 132.  Alzadon

13   requests complete and legible copies of text messages.

14        Have you-all worked that out, Mr. Friend?

15        Apparently some of the text messages that were provided

16   were illegible or incomplete.

17               MS. EDWARDS:  Your Honor, that may have been the

18   government's request of some materials provided by Mr. Curtis.

19               MR. CURTIS:  That is correct.

20               THE COURT:  All right.  I made incorrect notes here.

21               MR. CURTIS:  And, Judge, I have talked to Mr. Lynch,

22   and we have that resolved.

23               THE COURT:  You have resolved the issue with regard

24   to text messages?

25               MR. CURTIS:  Right.  If I'm going to use them, I'm

1    going to furnish him a full thread and legible copies.

2              THE COURT:  Mr. Lynch.

3              MR. LYNCH:  Yes.  On that, Your Honor, I think it's

4    like a slightly different issue than you might have been

5    raising here.  But my understanding of what Mr. Curtis is

6    going to offer is, if he anticipates using the text

7    messages -- what we have right now are illegible text

8    messages, snippets of text messages -- my understanding is

9    that he would provide the entirety of the text messages, and

10   he said three days before --

11             MR. CURTIS:  That's correct.

12             MR. LYNCH:  -- the anticipated testimony.

13             THE COURT:  And you can agree with that?

14             MR. LYNCH:  We can agree as long as -- we need to see

15   the messages, but yes.

16             THE COURT:  Three days before?

17             MR. CURTIS:  Right.

18             THE COURT:  And, Mr. Curtis, you know you can get

19   them?  There's not going to be an issue with you getting them?

20             MR. CURTIS:  No.  I don't even know if I'm going to

21   use them yet.

22             THE COURT:  Okay.  Well, they need to have an

23   opportunity to review them in completion then.

24             MR. LYNCH:  And, Your Honor, the only thing -- I

25   think we mentioned this in our motion for the pretrial

1    hearing.  We don't know the volume, so if it is -- if they're

2    going to put on a witness that has voluminous text messages

3    that we haven't seen before, you know, if you want to provide

4    it ex parte to the Court beforehand, if you want to make that

5    decision about whether or not it's voluminous.  I would not

6    want to be in a situation where we're dumped with, you know, a

7    large production and we need to take a recess and waste the

8    jury's time.

9              THE COURT:  Mr. Curtis.

10             MR. CURTIS:  Judge, I like to have everything

11   streamlined.  There's not going to be a whole lot.

12             THE COURT:  Okay.  Well, you can understand the

13   concern here?

14             MR. CURTIS:  Right, I understand.

15             THE COURT:  And, again, we're going to get a jury in

16   here for three weeks, and that's a huge burden on them, so I

17   don't want us to end up taking recesses for people to look at

18   things.

19             MR. CURTIS:  I agree.

20             THE COURT:  And you'll give me a heads up if

21   something changes?

22             MR. CURTIS:  Yes, ma'am.

23             THE COURT:  All right.

24        And, likewise, any defendant, if you've got anything that

25   has not yet been provided, I need a heads up well in advance.

1      Do you understand, Mr. Friend?

2          MR. FRIEND:  Yes, Your Honor.

3          THE COURT:  And do you understand, Mr. Chapman?

4          MR. CHAPMAN:  Yes, Your Honor.

5          THE COURT:  Okay.  I want to respect the jury in this

6  case.

7          MR. LYNCH:  Yes, Your Honor.  We raised the issue in

8  the context of Rule 26.2, just any sort of --

9          THE COURT:  Okay.  I remember now.  It's sort of

10  reverse Jencks.

11          MR. LYNCH:  Exactly, Your Honor.

12          THE COURT:  All right.  Thank you.

13      Now, Mr. Curtis, I believe that you asked me to preclude

14  the government from making gratuitous or soliciting gratuitous

15  negative testimony about your client and her personality.  Is

16  that correct?

17          MR. CURTIS:  That is correct.  Abrasive, callous.

18          THE COURT:  Mr. Lynch, do you-all have any intention,

19  or Mr. Pardesi?

20          MR. PARDESI:  So, Your Honor, as we tried to lay out

21  in the papers, we have no intention of gratuitously attacking

22  Ms. Vanhoose's character.  You know, it may well be that as

23  witnesses are testifying regarding the manner in which they

24  engaged with Ms. Vanhoose when they confronted her with

25  numerous of the fraud issues that will come to light at trial

1   that she reacted in an abrasive and aggressive manner.  That's

2   the extent to which.  But certainly one of the questions is

3   not going to be to tell us how mean Ms. Vanhoose was.

4           THE COURT:  Okay.

5           MR. CURTIS:  Well, for them to say she's not a very

6   nice lady, you know, that's completely irrelevant, it's

7   prejudicial, and it serves no relevance or probative value

8   whatsoever other than to smear her.

9           THE COURT:  Well, I'm going to allow them to explore

10  fully with witnesses for the government the kind of orders and

11  the manner and method in which they were conveyed.  The United

12  States has announced it's not going to solicit anything that's

13  gratuitous.  But if things are given with a firm no questions

14  kind of manner, sometimes that could be an indication of

15  consciousness of guilt or intent to defraud.

16      So I'm going to permit them to elicit testimony regarding

17  the manner and method in which orders were given but nothing

18  further.

19      And I can assume that you would make a timely objection

20  at trial if it gets out of hand?

21          MR. CURTIS:  Yes, ma'am.

22          THE COURT:  Very well.

23          MR. PARDESI:  Thank you, Your Honor.

24          THE COURT:  Now, that covers all of the defendants'

25  motions that I think required ruling.  Are there any others?

22

1    Mr. Friend?

2         MR. FRIEND:  None that I can think of, Your Honor.

3         THE COURT:  Mr. Chapman?

4         MR. CHAPMAN:  No written motions, Your Honor, but I

5    do have a matter to bring up with the Court.

6         THE COURT:  Okay.  Give me just one minute and I'll

7    take it up.

8    Mr. Curtis, anything else on the written motions?

9         MR. CURTIS:  No, Your Honor.

10        THE COURT:  Okay.  I think now we have resolved all

11   of the written issues.

12   Do you have any from the United States that I didn't

13   address?

14        MR. PARDESI:  Your Honor, just for clarification

15   purposes.  I think Your Honor was referencing the fact that

16   any issues that were brought up in the omnibus that were not

17   contested are resolved in the government's favor.  I just want

18   to clarify with respect to the 902(11)s that those documents

19   that we have noticed with respect to the 902(11), that they

20   are admissible evidence and that we don't need to call records

21   custodians to testify.

22        THE COURT:  It's my understanding that the parties

23   have reached an agreement and that there is no objection.

24   Mr. Friend, is that correct?

25        MR. FRIEND:  That's correct, Your Honor.

1          THE COURT:  Mr. Chapman, is that correct?

2          MR. CHAPMAN:  Yes, Your Honor.

3          THE COURT:  And, Mr. Curtis?

4          MR. CURTIS:  Yes, ma'am.

5          THE COURT:  All right.  So I will deem those

6     pre-admitted.

7       Are they marked, premarked for identification and

8     admission?

9          MR. PARDESI:  Yes, Your Honor, they are.

10          THE COURT:  Very well.

11       And, counsel, I know that a lot of people like to have

12     their evidence come in in order, but I want all of the

13     exhibits premarked for identification before we come into that

14     courtroom.  It wastes time for people to say "Give me a

15     sticker and let me mark it," and, "Madam Clerk, where were

16     we."  I want them premarked and ready to go.  Because that

17     doesn't mean a thing other than we can find it in the record.

18          MR. PARDESI:  Understood, Your Honor.

19          THE COURT:  Very well.

20          MR. PARDESI:  Thank you.

21          THE COURT:  Let me handle a couple matters, and then

22     we'll get to your motion, Mr. Chapman.

23       Let me ask a question.  Does Mr. Bregenzer intend to

24     claim privilege regarding conversations with his private

25     investigator?  I think I saw something in the papers about

24

1     that.

2           MR. CHAPMAN:  No, Your Honor, we don't intend to

3     claim privilege with respect to that witness.  And in fact, he

4     may be called as a witness depending on how the evidence comes

5     in.

6           And I will note that I believe that that investigation,

7     to the extent that it had counsel involvement, that would have

8     been his private counsel that would have ordered it.  I think

9     it's his privilege to waive.

10          THE COURT:  And he would waive that?

11          MR. CHAPMAN:  We need to make that decision to the

12    extent that there is a privilege, but we certainly understand

13    that we would be waiving it should we put that witness on the

14    stand.

15          THE COURT:  Okay.  Very well.

16          MR. LYNCH:  Your Honor, on that issue, I think we

17    would like the ability to talk to Clay Mason, that

18    investigator, in advance of his testimony.

19          Our understanding is Clay Mason was retained by KAC, the

20    entity, to conduct some sort of investigation.  I haven't

21    talked to him, really don't know much about it, but this sort

22    of came up on the entire advice of counsel issue.  The

23    privilege holder there is KAC the entity, not necessarily

24    directly Bregenzer.  But the problem we had is we were able to

25    obtain waivers from the other owners of KAC the entity, but

25

1    Bregenzer objected.  I think that is -- if he's going to

2    testify now, we should have a waiver now.

3                THE COURT:  Okay.  Mr. Chapman.

4                MR. CHAPMAN:  Your Honor, the case law with respect

5    to waiver on advice of counsel is still fuzzy and doesn't seem

6    to expressly require that waiver.  But here we're not dealing

7    with advice of counsel, we're dealing with an investigator who

8    conducted an internal investigation whose information only

9    becomes relevant to the extent it's necessary to rebut one of

10   the government's witnesses who may testify differently from

11   the reports that were obtained.  I don't think the disclosure

12   or waiver is required at this juncture, and it's certainly

13   dependent upon whether the evidence comes in.

14       That being said, I'm not aware of any attempt by the

15   government to contact the witness in question, and I don't

16   believe that he has raised privilege in response to any

17   communication from the government.  And I know the government

18   is very, very much able to contact witnesses in this case.

19               THE COURT:  So you would have no objection to them

20   contacting Mr. Mason?

21               MR. CHAPMAN:  No, Your Honor.

22               MR. LYNCH:  Very well, Your Honor.  We did not

23   contact him because of the privilege issue, but if there's no

24   privilege issue, we will be reaching out.

25               THE COURT:  All right.

1        Is that correct, then, Mr. Chapman?

2              MR. CHAPMAN:  Yes.

3              THE COURT:  And they're going to be reaching out to

4    Mr. Mason?

5              MR. CHAPMAN:  Yes, Your Honor.

6              THE COURT:  Very well.

7        And I think we've already talked about the 26.2

8    disclosure by the defendant.  So we've covered that.

9        Now, I'll hear from you, Mr. Chapman.  You had another

10   motion.

11             MR. CHAPMAN:  Yes, Your Honor.  I believe we were, at

12   12:56 yesterday, served with Government's Exhibits 51 through

13   58, 77A through H, and 160.

14       Those exhibits are summary charts that relate to a

15   voluminous amount of data, including probably hundreds of

16   thousands of lines of Medicare -- well, Medicaid as well as

17   prescription data.  And it appears that the amount of time and

18   effort that went into creating these exhibits was extensive.

19   They compared this information and essentially look like

20   closing argument slides that may be presented to the jury.

21       My concern here is that under 1006 and also under the

22   Sixth Circuit precedent in *Bray* and *Jameson* -- which I can

23   certainly provide a citation to the Court if necessary --

24   these were not provided in sufficient time for us to review

25   and check the accuracy of the computations.  And in fact, on

1    their face there appear to be some glaring inaccuracies

2    already.

3         We haven't raised this in a written submission, although

4    we intend to do that.  But given trial is starting and the

5    Court has indicated that you'd like to get out ahead of these

6    issues before we see a jury, I figured I'd raise this issue

7    today.

8              THE COURT:  Very well.

9              MR. CHAPMAN:  When we look at *Bray* and *Jameson*,

10   Your Honor, we see that the charts must be produced to us

11   within a reasonable time for us to inspect them, and, of

12   course, two business days before trial leaves us somewhat

13   flatfooted, especially with the near daily disclosures the

14   government continues to make.

15        There was an exhibit deadline.  That was not followed in

16   this case, Your Honor.  And the voluminous information that

17   was provided by the government that is the source for this

18   information is so voluminous, it would be impossible for us to

19   have done this work before the government presented their

20   charts.  This is not a log of passengers on an airplane flight

21   that we could have looked at to determine the accuracy of the

22   exhibit, it's much more complicated than that.

23        So we would ask at this juncture for exclusion, and we

24   will also file a motion to the extent the Court doesn't

25   resolve the issue today and wants to see written submissions.

1          MR. LYNCH:  Response, Your Honor?

2          THE COURT:  You may.

3          MR. LYNCH:  We noticed in our exhibit list from the

4    very beginning in August that we were going to have summary

5    exhibits.  In multiple prior trials that I've had in this

6    district before this Court, we have disclosed -- the

7    government has disclosed summary exhibits the week before

8    trial.  In the last trial I had with Mr. Chapman, the

9    disclosure deadline was the Friday before trial.

10         The summary exhibits were marked on the exhibit list as

11   summary exhibits.  We noticed them in the exhibit list going

12   back to, I think, August of last year.  We produced them in a

13   manner consistent with what we had done in prior practice

14   before this Court.  We certainly did not get any outreach from

15   the defense expecting an earlier disclosure deadline for the

16   summary exhibits.

17         We've received from Mr. Chapman, Bregenzer all of his

18   exhibits only, I believe, last week, and they are also quite

19   voluminous.  We're working through the records.

20         I also think that the summary exhibits that we have here

21   are pretty basic pivot tables that you can create from just

22   Microsoft Excel and summing up different categories of

23   information.  They're not -- this doesn't require calculus, it

24   requires addition with the aid of Excel.

25         And we don't anticipate the witness, who we also

29

1    identified as a summary witness who would be talking about

2    these exhibits, we identified her back in April, I think, and

3    then in August again.  She will not be testifying until, we

4    believe, March 10th.

5              THE COURT:  Okay.  I'd like to, first of all, see

6    these exhibits.  I don't know -- I think I understand your

7    objection well enough that I don't need writing on this.

8         I think, though, the one thing I want to make sure of,

9    Mr. Chapman, is, are you saying that you believe that they are

10    incorrect, or that you just don't have time to test the

11    validity of them?

12              MR. CHAPMAN:  Both, Your Honor.  So there's a few

13    inaccuracies that we can already see with respect to how the

14    data is compared, but getting a witness to go through this

15    data and check the accuracy would be incredibly

16    time-consuming.  If the Court does allow this information in,

17    which we still hold our objection to, we would ask that the

18    Court would permit us sufficient time to be able to develop

19    the testimony of a counter-witness to deal with this going

20    before the jury.

21              THE COURT:  All right.  Well, I'll take this under

22    advisement and let you know on Monday morning what my ruling

23    would be.

24         Can you get those to me pretty soon?

25              MR. LYNCH:  Yes, Your Honor.  You've been receiving

1   our emails?

2   THE COURT:  Yeah.  Just send it to the chambers'

3   email, if you would.  Thank you.  All right.

4   And as to inaccuracies, go ahead and address that now,

5   Mr. Lynch.  He's concerned that they can't really test this

6   and that there's some comparisons that are made in the data.

7   Is that correct?

8   MR. LYNCH:  I don't know what the inaccuracies are.

9   I think it's -- you know, basically what we have here, there's

10  three datasets, again, that were identified on our exhibit

11  list.  One dataset is Medicare data.  I think it's -- you

12  know, we produced that at some point in 2023, Your Honor.  A

13  second dataset is Medicaid data.  We produced that at the same

14  time.  I want to say we probably produced both around November

15  of 2023.  Shortly after indictment, we ran an updated dataset.

16  Those two datasets are on our exhibit list.  They've been on

17  our exhibit list since August of 2023.  So the defense has

18  known exactly where we're going to be deriving that data from.

19  And the third dataset is derived from the KASPER, the

20  PDMP data.  Again, that was noticed on our exhibit list in

21  August.  You know, there's a line -- I think Exhibit Number

22  160 says, you know, prescribing data for José Alzadon and

23  Doctor-1, and in the column where the Bates number is, we say,

24  exhibit will be derived from and the Bates number for the

25  KASPER data.  The same thing for the billing data.

1          THE COURT:  All right.  Well, I'll take a look at it

2     and then I'll give you the benefit of my ruling.

3          If you can get it to me tonight, I may be able to take a

4     look at it tomorrow and get back with you-all.

5          Anything else, Mr. Chapman, that you can think of?

6          MR. CHAPMAN:  Yes, Your Honor, and it relates to

7     another disclosure from yesterday.

8          We received a statement of a witness.  For purposes of

9     this, I'll just say Doctor-3.  It's one of the witnesses who

10    may be testifying.

11         MR. LYNCH:  Yeah, Dr. McClain.

12         MR. CHAPMAN:  I just noticed that Doctor-1 and 2 have

13    been used here.

14         This statement informed us that she indicates that she

15    did not sign off on some of the charts.  We investigated that

16    statement that, again, we received yesterday, and that drew us

17    back to an email from Special Agent Terry of the FBI who --

18    when we put these two statements together, we learned that an

19    eClinicalWorks database was created and eClinicalWorks gave

20    Special Agent Terry the ability to go through the charts in

21    this case.  And when she would export a chart from the

22    eClinicalWorks database, it would put a signature on that

23    chart sometime around the March of 2022 time period.

24         A patient record attached to the statement that was

25    produced yesterday indicated that the chart was signed, I

1    believe, in 2022, and, of course, the doctor indicated that

2    she did not sign the chart because she was not working at the

3    practice in 2022.

4        Our concern here is that the government's exhibits appear

5    as if the charts are signed in 2022 when in reality that was

6    the result of Special Agent Terry submitting the chart --

7    well, exporting the chart which would cause it to be

8    automatically signed on the date that she exported the chart,

9    thereby making it appear as if the doctor signed the chart and

10   consented to certain treatments that were on the chart when in

11   fact that wasn't correct.

12       Again, this relates to a late disclosure that highlighted

13   an issue for us.  But it even goes further, Your Honor.

14       We were unaware that Special Agent Terry had such

15   unlimited access to eClinicalWorks, and under federal statute

16   and regulation 42 CFR, Part 2, the treatment records of

17   drug-addicted patients are to be kept private.  Law

18   enforcement may have access to them, but there are limitations

19   ordered by this Court that the people who receive those

20   records -- the people who relate to those records must receive

21   a disclosure.  My concern is the unlimited access by this

22   special agent to the eClinicalWorks profile.

23       And it even gets worse, Your Honor.  We learned that

24   Special Agent Terry, through some of the statements in this

25   case, had actually used these records and this access to

1    identify a patient who had a criminal history, something that

2    is absolutely prohibited by federal statute and regulations.

3    She approached this patient as she was picking up her

4    medication at the pharmacy.  Then when that patient drove

5    away, she was followed to her home.  And my understanding from

6    the statements of the patient -- and, of course, I did not

7    observe this.  I'm going on the information I've received --

8    is that this patient was apprehended in her home on a prior

9    warrant that was out of county, transported, and interrogated

10   at the police station.

11       The reason this statute exists is to protect patients who

12   have drug addiction and allow them to seek treatment and

13   disclose what they need to to their providers.  Unlimited FBI

14   access was prohibited by this Court.  Not only do we have that

15   access, but we also have the alteration of the charts by the

16   FBI and the unlimited disclosure, which I believe is outside

17   of the warrant.

18       We did not raise these issues, Your Honor, until we saw

19   and connected the dots with the statement of Dr. McClain

20   discussing the fact that she did not sign the chart on that

21   day.  This raises a very real concern not only of intimidation

22   of witnesses given that this will be a witness on the stand

23   for the government -- and I'm talking about the patient -- but

24   also in a violation of clear federal law, and we'd ask that

25   the government's chart exhibits be excluded to the extent that

1    they show a signature of a doctor as a result of an FBI

2    operation.

3          MR. LYNCH:  Response, Your Honor?

4          THE COURT:  Yes.

5          MR. LYNCH:  I vigorously dispute a lot of that

6    factual recitation.

7          First point.  I believe Exhibits 101 to 105 are five of

8    the six charts we're going to be talking about in this case.

9    Those were obtained pursuant to a grand jury subpoena directly

10   from Kentucky Addiction Centers.  That is the origin of those

11   records.  There's really no way to dispute that.  Those were

12   obtained either in late December of 2022 or, I think, in

13   January of 2023.

14         So those are records we did not -- the root of those

15   records is not somehow Agent Terry hacking into some platform

16   to get them.  It is pursuant to a grand jury subpoena that was

17   sent to Kentucky Addiction Centers.  Kentucky Addiction

18   Centers produced those records and sent them back to us.  I

19   said this all in an email to Mr. Chapman last week.  It's a

20   little surprising that he isn't referencing that sort of

21   contrary to the factual recitation here.

22         As to the last medical record, I think it's Exhibit 106

23   for patient SBR is how I will identify her here.  That record

24   was obtained through an administrative subpoena directly from

25   eClinicalWorks.  But, again, with regards to that subpoena, to

1    my knowledge, no law enforcement personnel was involved in the
2    collection of that medical information.  It came from the
3    eClinicalWorks custodian.  And I believe a custodian has
4    signed a 902(11) certification as to those business records
5    for that medical record, produced that separate medical
6    record, again, to the government.
7        So it's just not the case that Agent Terry obtained any
8    of those records.  Like, that's just not the case.  I'm happy
9    to -- we also -- you know, this was all also -- we sent a
10   pretty detailed letter to all defendants about the basis for
11   admissibility for the medical record exhibits.  We provided
12   the 902(11) certifications.  We did this, I think, in early
13   December.  This is the first time this is being raised.
14   There's sort of a lot of paper that contradicts what
15   Mr. Chapman has just said.
16       As to the OBOT order we did obtain in this case, and it
17   was produced in discovery, the OBOT order, and we've complied
18   with that.  To my knowledge, we've complied.  We've had the
19   case team -- we've had the case team inform everyone that we
20   have been able to inform that the government does have those
21   records.
22       As you can imagine, Your Honor, you know, we are dealing
23   with a vulnerable, sometimes transient community.  Are there
24   people who aren't at the address they were previously at, or
25   don't have the phone number or contact information they

1   previously had?  Yes.  Did we try our best?  Yes.  Has this

2   issue been raised by the defense before today?  No.

3            THE COURT:  Well, what about the fact that this

4   particular witness had law enforcement come to her house?  Do

5   you know anything about that?

6            MR. LYNCH:  I believe -- you know, for all of the

7   witnesses -- and I know that the defense has this too -- we

8   have access to -- we have interviewed patients throughout this

9   case.  The OBOT -- I'm not going to be able to cite chapter

10  and verse here, Your Honor.  But we have communicated with

11  these different beneficiaries who did go to Kentucky Addiction

12  Centers, and, you know, sometimes the communication was by

13  calling them, sometimes the communication was by, yes,

14  visiting their house, email.  There's a variety of ways that

15  we have communicated with the witnesses.

16      To my knowledge, there's no prohibition on contacting

17  witnesses.  And in this case we needed to contact them because

18  they were the vehicles to perpetuate significant fraud on

19  behalf of Medicare and Medicaid.

20           THE COURT:  So the contacts were made for purposes of

21  discussing the manner and method in which they received

22  treatment at the clinic.

23      Were any arrests made of any of the individuals for their

24  own criminal conduct?

25           MR. LYNCH:  So I think that the incident -- and

1    Mr. Chapman can correct me on this.  I want to make sure --

2    I'm speaking from memory, and I want to go back and look at

3    this.

4        One of the beneficiaries -- I can identify her here as

5    RB -- she is -- yeah, just a couple things on RB.  First of

6    all, I'm informed by my co-counsel that we did not find Robin

7    Brown through patient records.  I think I'm imagining we ran

8    some sort of clear report or some sort of report to determine

9    where her address was.

10       I believe -- I don't know if it was in the course of, you

11   know, here's Robin Brown, here's her Social Security number,

12   her date of birth.  In running that report, I believe the

13   sequence was they at some point determined that she did have

14   some sort of failure to appear or some sort of --

15            THE COURT:  An outstanding warrant?

16            MR. LYNCH:  -- an outstanding warrant.  You know, in

17   that situation, Your Honor, I think that law enforcement will

18   know about that, right?  I'm not going to be well versed in

19   the particulars here, but if there is an outstanding warrant,

20   that sort of presents a different issue.

21       This is not a case, though, about, you know, Robin Brown

22   went to Kentucky Addiction Centers, confessed to using

23   opioids, and then she was sought out and arrested for illegal

24   possession of controlled substances.  I want to double-check

25   the factual record here, but that is not -- again, with the

1    caveat that I want to just make sure I've got my ducks in a

2    row, that is not what happened here.

3        THE COURT:  All right.  We can talk about this more

4    later, and I may have you-all write something on it.

5        But from what I understand, Mr. Chapman, you're saying --

6    are you talking about this Robin Brown?  Are we talking about

7    the same person?

8        MR. CHAPMAN:  Yes, Your Honor, we are.

9        THE COURT:  Okay.  And are you aware of any other

10   patients who were either arrested or threatened with arrest

11   for their own criminal conduct?

12       MR. CHAPMAN:  Not at this time, Your Honor.  Not

13   based on the statements I have.

14       THE COURT:  All right.  Well, I think I understand

15   this better.  You're going to take a look and give us more

16   information.  But I understand that the FBI got most of its

17   information through its grand jury subpoenas rather than

18   through any kind of tapping into a computer system and

19   extracting it independently?

20       MR. LYNCH:  That's correct.  I know early on there

21   was a -- I just want to make two points for the record,

22   Your Honor.

23       First of all, I do know that before the investigation was

24   overt, I believe there were -- and we all already had the OBOT

25   order, but I believe there were EMR search warrants executed.

1     And they're, I think -- we didn't go through the Kentucky

2     Addiction Centers, we served the warrant directly on, I think,

3     eClinicalWorks.  But we ultimately didn't use those.  Those

4     records aren't part of the exhibits that are in this case.

5     What we're using is the records that we subsequently got

6     through grand jury subpoena.

7          The second clarification point that I just want to make

8     on Robin Brown is, I believe -- I'm pretty certain about

9     this -- that the first contact with Robin Brown did not result

10    in any sort of --

11                MS. EDWARDS:  That was the first contact.

12                MR. LYNCH:  That was the first contact.  Sorry.

13    Never mind.  I'll scratch the second point.

14                THE COURT:  Okay.

15                MR. CHAPMAN:  Your Honor?

16                THE COURT:  Yes, Mr. Chapman.

17                MR. CHAPMAN:  To the extent that you ruled on this

18    before, written submissions, I just want to make sure that I

19    add a few facts in here.

20         We are talking about patient RB, and my understanding is

21    that she contacted KAC and spoke to a witness in this case,

22    Christy Elrod, and during that conversation she relayed that

23    after she sped away, she was apprehended at her home with

24    Special Agent Terry along with the Winchester Police

25    Department.  She was informed that if she didn't talk, she

1    would be subpoenaed to the grand jury.  Winchester took her

2    into custody for a warrant related to a bad check to a

3    dentist's office in 2003.  She was transported to Montgomery

4    County -- I'm sorry.  The incident occurred in Montgomery

5    County.  She was transported to Winchester jail and then

6    Montgomery County, and she was interviewed in Winchester jail.

7         And obviously the concern here is that Winchester police

8    showed up with Special Agent Terry according to the statement

9    of the patient, and she was arrested on a warrant over

10   20 years old out of county and apprehended for that.

11        Despite her unwillingness to talk before this incident,

12   she then sat down with the government several times and

13   made -- I believe several times -- and made statements that

14   supported their case enough to have them put the patient on

15   the witness list.

16             THE COURT:  Okay.  I know that you need some time to

17   double-check things.  Why don't you file a written motion --

18   and, again, I don't need tones on these, Mr. Chapman -- and

19   recite your factual allegations so that we have the benefit of

20   reflection as we respond to these things.  I think it will be

21   helpful.  And I don't think this is something we have to

22   actually rule on right before the trial begins, so I'll rule

23   as quickly as I can.

24        But if you can get me that in the next couple of days,

25   I'd appreciate it, and then a response in the next couple of

1          days.  I know you're all busy with other things, but this is
2          important that we get it resolved.

3              Anything else, Mr. Chapman?

4                      MR. CHAPMAN:  No, Your Honor.

5                      THE COURT:  Any motions from you, Mr. Curtis?

6                      MR. CURTIS:  No, Your Honor.

7                      THE COURT:  Mr. Friend, anything from you?

8                      MR. FRIEND:  No, Your Honor.  Thank you.

9                      THE COURT:  Anything else from the government, any
10         motions.

11                     MR. LYNCH:  No motions.  A couple items, I guess,
12         Your Honor.

13                     THE COURT:  All right.  You may address them.

14             I'm going to go through a list of things about the method
15         of proof and jury selection, so if it has something to do with
16         that, you might want to hang onto it.

17                     MR. LYNCH:  I think it's slightly different from
18         trial issues.

19                     THE COURT:  Okay.  You may.

20                     MR. LYNCH:  One thing on evidence.  We did get
21         Bregenzer's exhibit list last week and we've started to go
22         through it.  We do think that there are a lot of exhibits that
23         he's marked that are -- you know, Mr. Friend in his motion in
24         limine talked about sort of the highly inflammatory nature of
25         some of the text messages between individual 1 and Kristy

1     Berry.  We're not referring to her as a cooperator in the

2     papers, but Kristy Berry has obviously pled guilty and is

3     cooperating in this case.

4         So Kristy Berry, you know, was in a romantic relationship

5     with Dr. Alzadon, and there are thousands and thousands of

6     text messages between the two of them, including highly

7     inflammatory ones that -- you know, I won't say that they're

8     definitely inadmissible, but it's hard for me to think of a

9     reason why they would be admissible.

10        We talked about this with Mr. Friend before the trial.

11    We do not need to get into sort of highly personal issues.  I

12    don't even need to get into them here, Your Honor.  But I --

13    you know, that is not our goal.  That is not our intention.  I

14    know, though, that from looking at, you know, Exhibits 310 and

15    312 on Bregenzer's exhibit list, it includes just a lot of

16    sort of salacious, and, again, I can't really think of how

17    those text messages would be admissible.

18        I don't think I need to give any examples here, but I

19    want to -- I haven't been able to go through all of

20    Mr. Bregenzer's exhibits, but the ones that I've seen so far

21    give me cause for -- give me some pause both because of what

22    Dr. Alzadon has said in pleadings and just, you know, I don't

23    think we need to have a sideshow here about this personal

24    relationship.

25              THE COURT:  Okay.

43

1          Is that your intention, Mr. Chapman?

2          MR. CHAPMAN:  The difficulty here, Your Honor, is

3    that we don't know exactly how the government's case is going

4    to shake out.  I don't know if Kristy Berry is going to

5    testify one way or another, and I don't know if Dr. Alzadon is

6    going to take the stand and testify one way or the other.

7          I think that there is a theory of relevance related to

8    the relationship that may be relevant in this trial.  It has

9    always been our position that a lot of information was kept

10   from Mr. Bregenzer and he was prevented from knowing certain

11   aspects of the clinic.  I think these text messages bear that

12   out.

13         However, there may be very good reasons not to get into

14   this information.  And what I communicated to Mr. Lynch when

15   he inquired about this is that I am including almost all of

16   the material I would use for cross-examination out of an

17   abundance of caution so that we make sure that this is

18   identified for the government, and that's not to say that we

19   are definitely going to use it.

20         THE COURT:  All right.

21   Mr. Friend?

22         MR. FRIEND:  Likewise, Your Honor, I've not tried a

23   case with Mr. Chapman or Mr. Lynch yet, but I would anticipate

24   this is a real moving target on these sort of things.  So I

25   think we'll just continue to work as we see how the proof

1    comes in.  Because, again, we're in a similar situation with

2    the volume of messages and exhibits that we would certainly

3    reserve our right to object as we need to as that goes on.  If

4    it becomes clear that they're going to attempt to introduce

5    some things we don't need to, we may try to, again, get ahead

6    of it and insert a timely objection if it starts to comes in.

7            THE COURT:  Well, what I'll do is I'm going to count

8    on everybody to avoid unnecessary things that may be

9    inflammatory or unnecessarily salacious issues.  I recognize

10   there is a personal relationship here and that may get in one

11   way or another, either to test credibility or to look at

12   motive.

13        What I will say is that -- first of all, I doubt that

14   this is going to become an issue unless the defense puts on a

15   case and people testify.

16        If you're going to put something in that you think is

17   questionable, I'm going to direct that you approach the bench

18   and let me see and hear it before it comes in, because I can't

19   unring the bell with the jury.  There may be a time that it is

20   completely relevant even if it is uncomfortable.

21        So I'm going to direct all parties to do that before

22   introducing anything of a sexual nature or that is highly

23   personal that may be sensitive in a court of law.

24            MR. LYNCH:  Thank you, Your Honor.

25        And just a couple of other issues.

1          THE COURT:  You may.

2          MR. LYNCH:  We interviewed, two weeks ago, another

3    former KAC owner named Chuck Moran.  He's represented by

4    counsel.  My understanding now -- you know, we interviewed

5    him.  I got a call earlier this week from counsel for

6    Mr. Moran saying that -- you know, we've obviously produced

7    the report of interview for Mr. Moran.  He's on, I believe, at

8    least Bregenzer's exhibit list.  And after the interview, I

9    was informed that, I guess, a private investigator showed up

10   at Moran's house and subpoenaed him.  I think it's a Bregenzer

11   subpoena.

12         Mr. Moran's attorney has now reached out to me requesting

13   both -- you know, during the course of the interview, we

14   showed Mr. Moran several documents that are just exhibits for

15   the trial.  And, you know, obviously we've produced the report

16   of interview.  Mr. Moran's attorney reached out to us

17   requesting those documents because he would like to make a

18   determination as to whether or not Mr. Moran will invoke.

19         We don't really have a dog in this fight.  I wanted to

20   raise the issue before the Court and the parties if anyone in

21   the defense has an objection to the government providing those

22   requested pieces of information.

23         I have a copy of the report if you'd like to see it,

24   Your Honor.  And the exhibits, I think they're the trial

25   exhibits.

1          THE COURT:  Very well.

2      Mr. Friend, do you have an objection?

3          MR. FRIEND:  No, Your Honor.  Thank you.

4          THE COURT:  Mr. Chapman?

5          MR. CHAPMAN:  I don't have an objection.  I'll also

6    mention, Your Honor, I spoke to this witness's counsel as

7    well, and my understanding is the government did not give a

8    clear indication as to whether -- I think they indicated that

9    he was, I believe, a subject status currently, which is why

10   there is a question as to invoking the Fifth Amendment.

11       My concern there is that this case was indicted a long

12   time ago.  I don't imagine the government reasonably believes

13   that they intend to reopen a grand jury against this witness,

14   and perhaps the subject status can be removed so that that

15   decision could be much easier for counsel, the witness, and so

16   that we can have the truth before the jury.

17          THE COURT:  All right.

18      Mr. Curtis?

19          MR. CURTIS:  No objection.

20          THE COURT:  Okay.  Do you want to respond to the

21   subject status issue, Mr. Lynch?

22          MR. LYNCH:  We did inform Mr. Moran that he is a

23   subject.  We've charged a conspiracy that runs through

24   December of 2020.  It is within the statute of limitations.

25   All of the facts that Mr. Chapman has recited are true.  I do

1    not want to be in the position of, you know, saying one way or

2    the other.  Like, I'm not --

3                THE COURT:  You don't want to immunize him at this

4    point, in other words?

5                MR. LYNCH:  Certainly not, Your Honor.  We also don't

6    know what's going to come out at trial.

7                THE COURT:  All right.  I'm aware of that.  I think

8    Mr. Chapman was offering it more as a suggestion.  It's clear

9    the government is not going to do that, nor would I expect

10   them to.

11       So you may provide Mr. Moran's lawyer with the

12   information that he needs in order to make the determination

13   of whether Mr. Moran would take the Fifth.

14               MR. LYNCH:  Yes, Your Honor, we will do that.

15       And then sort of a related issue.  I'm aware that there

16   are people sort of in the, I think, Moran category that are on

17   both defendants' witness lists.  Some are represented, some

18   are not represented.  You know, again, we have no idea how the

19   proof is coming in.  I'm just making an advisement to the

20   Court that we might need standby counsel for some of these

21   witnesses who were sort of involved in the operations of the

22   clinic.

23               THE COURT:  We can do that.  And then I can advise

24   them of their Fifth Amendment rights at the appropriate time

25   outside the presence of the jury.

1    I'm going to have to count on all of you to tell me about

2    when that issue might arise during the course of the trial.

3    Probably not until the defense, is that correct, or do you

4    anticipate this coming up in the government's case-in-chief?

5        MR. LYNCH:  I don't think it will come up in the

6    government's case-in-chief.

7        THE COURT:  Very well.  I'll have to rely on all of

8    you to keep me informed of this prospect.

9        Mr. Lynch, anything else?

10       MR. LYNCH:  We only have logistics, but I think you

11   might cover it.

12       THE COURT:  All right.  Let's talk a little bit about

13   logistics then.

14       Let me first ask, Mr. Friend, have you and your client

15   been offered a written plea agreement by the government?

16       MR. FRIEND:  Yes, Your Honor, we've had plea

17   discussions.  I believe plea discussions also probably

18   occurred with prior counsel before I was on the case.

19       THE COURT:  All right.  And have you discussed the

20   benefits and risks of either accepting a plea or going to

21   trial with your client?

22       MR. FRIEND:  I have, Your Honor.

23       THE COURT:  And he elects to go to trial after having

24   had those discussions?

25       MR. FRIEND:  Yes, Your Honor.

1          THE COURT:  And, Dr. Alzadon, has Mr. Friend

2     correctly represented your discussions with him?

3          DEFENDANT ALZADON:  Yes.

4          THE COURT:  Mr. Chapman, has your client been offered

5     a plea by the government?

6          MR. CHAPMAN:  Yes, Your Honor.  Prior counsel worked

7     through that plea.  I verified with former counsel that that

8     was gone over with my client, and that he understood his

9     rights, and that he elects to proceed to trial.

10          THE COURT:  All right.

11        Mr. Bregenzer, has your lawyer spoken correctly?

12          DEFENDANT BREGENZER:  Yes, Your Honor.

13          THE COURT:  Very well.

14        Mr. Curtis, has the government offered your client a plea

15     agreement?

16          MR. CURTIS:  Yes, Your Honor.  We've had several

17     conversations right at the beginning when I was first

18     appointed and even later on after the indictment, and each

19     time she has maintained that she does not want to plead.

20          THE COURT:  Is that correct, Ms. Vanhoose?  I need

21     you to speak up.

22          DEFENDANT VANHOOSE:  That is correct.

23          THE COURT:  All right.  I just don't want anybody to

24     go through a trial and say, My lawyer didn't tell me there was

25     a plea agreement out there.  So we've got that cleared up.

1    All right.  Let's talk a little bit about the Court's

2  schedule.

3    As you all may have figured out by my initial

4  conversation, I want to respect the jury in this case.  This

5  is going to be a long trial for any jury, and I think it's our

6  obligation to make it as efficient and smooth running as we

7  can.  Toward that end, I'm going to work with you outside the

8  presence of the jury to do as much as we can to ensure that

9  the evidence flows consistently in front of the jury each day

10  to minimize interruptions.  Not that we won't have to have

11  bench conferences, but I want to minimize them.  I want to

12  minimize recesses to look at documents.  So I'm going to count

13  on all of you to do your part toward that goal.

14    I will be here every morning before court.  I usually

15  take an hour and a half for lunch.  I know all of you-all need

16  to call your offices.  I know that people need to talk to

17  witnesses and catch their lunch as well.  So usually I will

18  reserve, you know, 15 minutes up to a half an hour, and if

19  you-all need to talk to me over the lunch hour, we'll make

20  that happen.  Then at the end of each day, I'll be available

21  to take up other matters.

22    I would expect that at the end of each day of trial that

23  the government give the defense an indication of the witnesses

24  it anticipates calling the next day.  And, likewise, I would

25  expect the defense to do something similar if we get to that

1    point.  But just the next day.

2        Now, I don't entertain speaking objections in court.  If

3    you can do it in one word, like "hearsay," "leading,"

4    something like that.  But if it's a substantive objection,

5    please stand and state your objection in a way that I can hear

6    you.  Courtroom A is a little bigger.  I'm going to have to

7    see you stand up.  I can't always hear and I want to be sure I

8    catch your objection in a timely manner.

9        So stand and object, and don't do the sort of moving up.

10   I know a lot of lawyers kind of do the moving up, maybe I'm

11   going to object, maybe I'm not.  Make your decision before you

12   open your mouth or stand up.  So let's get that objection on

13   the record.  And I want to be sure and hear them all.

14       Also, if you can stand when you're addressing the Court.

15   I want to be sure that I hear what you have to say.  I've

16   already told you about Courtroom A.  It's tough.  The sound

17   system is new and it's supposed to be the latest and greatest,

18   but it isn't always that way unless you're speaking right into

19   a microphone.

20       There is a podium up there, and I believe -- I'll

21   encourage all of you to go up there tomorrow or over the

22   weekend, whenever you can.  The clerk of court will be

23   available to help you to familiarize yourself with the

24   surroundings and the equipment up there.

25       Please ask the Court to approach the bench or before you

1   approach a witness.  I ask that you do that.

2       Lawyers and your assistants may all bring your computers

3   and your telephones into the court.  Turn those ringers off.

4   If you're like me, my life is on my phone, my calendar, my

5   appointments, anything I need.  I can even do a little

6   research on it.  But I'm going to ask you to confine your use

7   of your computers or phones to the business at hand.

8       If you have agents working with you, they're probably

9   going to call your witnesses.  They can have their phones and

10  computers.  I need a complete list.  If you have paralegals, I

11  need a list of who that's going to be so I can give it to our

12  court security officers so they can make that happen for you

13  when you come in.

14      If a phone rings in my courtroom, it's mine.  And I mean,

15  it's mine, and you don't get anything back.  So remember that.

16      Now, again, let me revert back to our schedule.

17      I'm going to ask the jurors to be here by 8:45 so that we

18  can get them in the courtroom hearing evidence at 9:00.  I try

19  never to go for more than an hour and a half without a break.

20  We just never can tell how often jurors need breaks.  Some of

21  them are diabetics and we have to deal with that.  We'll take

22  a morning break around 10:30.  Then as I said, we'll come back

23  in and go to lunch.  We'll take an hour and a half for lunch,

24  then we'll have two afternoon sessions with a break.

25      I try to end each day at or about 5:00.  And I'm going to

1    count on you-all to sort of help me gauge that as we go

2    through the trial.  Some of these jurors travel long

3    distances.  The days are getting a little bit longer, but I

4    just find that about six hours of evidence is all they can

5    absorb in a meaningful way.

6        Now, that's not to say if somebody has a witness on the

7    stand and we can finish with them if we stay another 15

8    minutes, I'll do that, and I'll explain that to the jurors.

9    And usually they want to finish with a witness if they

10    possibly can when we're in the course of a trial.  So I will

11    work with them and with all of you.  If we get toward the end

12    of the day, I'm going to be consulting with you about what it

13    looks like the evidence is going to be, and I'll ask for your

14    help in assisting me in gauging that.

15        Jury selection.  I conduct the voir dire.  I think all of

16    you have submitted your voir dire questions.  I'll try to

17    include each and every one of those questions.  We use jury

18    numbers.  Our jurors do not respond by name, they will be

19    identified by number.  I believe the jury fact sheets are

20    already available to all of you.

21        One of the things that I do when I'm conducting the

22    questioning of the panel is I'll let you sit on the opposite

23    side of counsel table so that you can watch and observe the

24    jurors' responses and match their numbers with their

25    appearance.  I will call on them and I will try to ask every

1    question or at least cover the subject matters that you have

2    suggested.  I will try.  I may not repeat the question

3    verbatim, but I'm going to try to be as inclusive as I can.

4        Once I have conducted the inquiry of the entire panel, I

5    will call counsel to the bench.  I will ask if there are any

6    questions that you would have me pose to the entire group or

7    if there are individual jurors that we would like to hear from

8    at the bench.  After we have conducted that exercise, I will

9    then ask you for your motions for strikes for cause, which

10    we'll handle at the bench.

11        It is my practice not to identify those jurors who have

12    either been excused or stricken for cause to the rest of the

13    jury.  I will identify them, of course, to all of you.  But I

14    don't like to inspire jury excuses, so I will handle that at

15    the bench with you and merely tell the clerk of court to

16    remove the names of the stricken or ineligible jurors from the

17    active pool.

18        Is there any objection to that, Mr. Lynch?

19            MR. LYNCH:  No, Your Honor.  And forgive the

20    unfamiliarity.  Where can we pick up the jury questionnaires?

21            THE COURT:  I'll handle that in just a minute.

22        Mr. Friend, any objection?

23            MR. FRIEND:  None, Your Honor.

24            THE COURT:  Mr. Chapman, any objection?

25            MR. CHAPMAN:  No, Your Honor.

1        THE COURT:  Mr. Curtis?

2        MR. CURTIS:  No, Your Honor.

3        THE COURT:  Okay.  It's available to all of you in

4    the clerk's office.  I think it's available right now.

5        Now, after I have exercised the strikes for cause, it

6    will be my intent to grant the United States, consistent with

7    Rule 7 -- because I'm going to seat three alternates.  That's

8    the reason.  I always like one alternate per week.

9        Does anybody see any reason for more alternates?

10       I mean, it is flu season and it is March madness.  We

11   won't talk about that today.

12       Mr. Lynch, I see you kind of grimacing.  Do you want

13   four?

14       MR. LYNCH:  I really don't want to do this -- you

15   know, I don't want to get down to we lose -- I think the last

16   two multi-week trials I've had, we've lost, I think, two or

17   three jurors.  But I also don't want to waste somebody's time.

18       THE COURT:  Yeah.  Well, I'm kind of inclined to

19   stick with three.  I'll put it this way.  If we get in here

20   and it gets a little tight, I might add one more.  And I'll

21   give you another one if everybody wants four.

22       Is that okay with everybody?  Let's just do four.  I'd

23   rather be safe than sorry.  Okay.

24       And with that in mind, then, I'm going to give the

25   defense an extra peremptory challenge.  The rule calls for

1    seven and eleven, but I'll give the defense one more.  So it

2    will be seven and twelve.

3         And for the defense, the strikes shall be for the first

4    nine used collectively, but I'll give each one of you an

5    individual strike.  And seven for the government.

6         What I do is, after we have exercised our strikes for

7    cause, I will ask the clerk to call a round of 34 and we'll

8    get everybody else out of the courtroom.  And then to aid you

9    in the exercise of your peremptory challenges, I will call on

10   each juror in the order that they were called, ask them to

11   tell us where they're from, what they do for a living, just

12   give you a chance to match their faces to that jury form so

13   you'll know who they are and a little bit about them.

14        Then I will exercise blind simultaneous strikes.  The

15   first 14 not stricken will be the jury.  You'll have a form

16   that you can check to use for your strikes.  The last four

17   will be the alternates.

18        It is my practice not to identify the alternates to the

19   jury or to the alternates.  I recognize that is a deviation

20   from the rule, but most people prefer it.

21        Any objection, Mr. Lynch?

22             MR. LYNCH:  No, Your Honor.

23             THE COURT:  Mr. Friend?

24             MR. FRIEND:  No, Your Honor.

25             THE COURT:  Mr. Chapman?

1          MR. CHAPMAN:  No, Your Honor.

2          THE COURT:  And, Mr. Curtis?

3          MR. CURTIS:  No, Your Honor.

4          THE COURT:  I think we want them all to deliberate

5    just like they're deciding the case.  I've never understood

6    the logic of that rule where we identify them.

7        So any questions about the number of alternates, the

8    number of strikes, any suggestions?

9        Very well.

10       All right.  And all the evidence is marked.

11       What other decorum questions do you have?

12       Mr. Lynch?

13         MR. LYNCH:  One issue -- and I confess, I've been

14   able to talk to Mr. Chapman about this but not the other two

15   defendants -- is having a laptop available for the jury for

16   deliberations.  We don't have to decide that now.  But we do

17   have voluminous records here.

18         THE COURT:  Yeah.  And we don't have any way, I don't

19   think, for us to put a laptop in the jury room.  But you-all

20   talk about that and we'll see if we can work something out.

21       Now, as you notice, we have evidentiary monitors in the

22   jury box.  You can work with our clerk of court to either

23   connect your own computers, or if you're using documents, I

24   call it an overhead projector, the ELM is right on counsel

25   podium.  So you will be able to reference documents right from

58

1    the podium.

2        Is that correct, Ms. Combs?

3            COURTROOM DEPUTY:  That's correct.

4            THE COURT:  I haven't tried a case up there since we

5    redid it.

6            MR. CURTIS:  I have.

7            THE COURT:  Okay.  So that will work for you,

8    Mr. Curtis?

9            MR. CURTIS:  Correct.

10        Judge, also advise them to be careful of their steps,

11    because where the counsel table is, I've seen people trip.

12            THE COURT:  Yeah.  Apparently we've tried to install

13    as many tripping hazards as we can.  I had six stitches from

14    tripping over the witness stand in that courtroom, so I can

15    speak from experience.

16        We'll try to figure out -- Counsel, I'm going to let you

17    all work that out.  If you want the jury to be able to look at

18    computer evidence in the jury room, we need some way of having

19    a computer that has nothing but the evidence on it.

20        Do you think you can work that out?

21            MR. CHAPMAN:  We can and will, Your Honor.  We just

22    had a quick chat, and I don't think any of the defendants have

23    an objection to it.  And we'll take a look at the computer

24    that the government provides to us ahead of time and make sure

25    that that's appropriate.

1    I would ask, Your Honor, that if we're going to do it

2    that way, if we could simply produce our exhibits to the Court

3    electronically so that we don't have to print off all the

4    paper.

5         THE COURT:  Absolutely.  I am about the fourth judge,

6    I think, on this case, and I realize that the last pretrial

7    order was entered by someone besides myself.  You don't have

8    to file your exhibits in the record in advance, just be sure

9    they're premarked.

10        Now, remember this.  Before I let -- except for the

11   documents that have been pre-admitted here today, before I let

12   a jury see those documents, even if you've put them on your

13   computer, I have to say it's admitted.  The clerk of court

14   will not show it to the jury.

15        And then I'm going to ask you, when you're finished with

16   an exhibit, let's get them taken down.  I don't like having

17   jurors distracted with some document that's sitting on the

18   screen for a half an hour that nobody is talking about.  I'll

19   try to help you with that.

20        So you-all are going to work on the computer issue.  Let

21   me know if there's a problem.

22        Yes, Mr. Lynch?

23        MR. LYNCH:  Yes, just two other issues.

24   Will we be doing openings on Monday, do you think?

25        THE COURT:  I would hope we could get to openings.

60

1        How long do you think that yours will take?

2              MR. PARDESI:  Your Honor, approximately 20 minutes.

3              THE COURT:  Okay.  Does anybody need more than

4    20 minutes?

5        Mr. Friend?

6              MR. FRIEND:  No, Your Honor.

7              THE COURT:  Mr. Chapman?

8              MR. CHAPMAN:  No, Your Honor.

9              THE COURT:  Mr. Curtis?

10             MR. CURTIS:  No.

11             THE COURT:  Okay.  I'm not going to put a time limit

12   on you, but I'm going to expect you -- if it goes more than

13   25, I'll probably say something to you.

14             MR. CHAPMAN:  Thank you, Your Honor.

15       Can we just be sure that defense openings aren't split

16   up?  If the government does it the first day of trial that we

17   don't have an opening hold over until the second day.  We'd

18   rather deliver them all.

19             THE COURT:  All at the same time.  I think we'll get

20   to them all.

21             MR. LYNCH:  We're just getting our witnesses ready.

22             THE COURT:  I understand.  You know what, let's not

23   plan on any evidence until the next day.

24             MR. LYNCH:  Okay.

25             THE COURT:  I think that by the time we drag these

1    jurors in, get them all shuffled around, I give them their

2    preliminary instructions, and they hear four opening

3    statements, I mean, that's, you know an hour and a half of

4    opening statements.  I think we're going to be able to get it

5    all in on the first day.

6         Now, what will happen is, if something happens and we

7    don't get a jury until 1:00 or 2:00, I may just send them home

8    and we may start all opening statements on Tuesday morning.

9         Again, I don't like wearing a jury down.  I want them to

10   be fresh enough when they hear your opening statements that

11   they're ready to hear evidence.  So if we don't get a jury

12   until 2:00, you won't need any witnesses until probably

13   lunchtime on Tuesday.

14        MR. LYNCH:  Okay.

15        THE COURT:  And I can make that happen.  So if that

16   helps you a little bit, Mr. Lynch.

17        MR. LYNCH:  Yes, Your Honor.  And, you know, we

18   hadn't thought about deadline to exchange opening slides, but

19   I guess that might be a little bit of flux.

20        THE COURT:  Well, if you've got opening slides, I

21   hope they're already done.

22        MR. LYNCH:  They are, yes.

23        THE COURT:  Okay.  Well, let's exchange them then if

24   you haven't already.

25        MR. LYNCH:  Okay.  Right now?

1           THE COURT:  Yeah.  Just send them to opposing

2   counsel.  Because I can't do anything about it if I don't get

3   them until Monday.

4           MR. LYNCH:  All right.

5           THE COURT:  Do you have any, Mr. Chapman?

6           MR. CHAPMAN:  We may, just a few.  That's always a

7   moving target that we don't finalize until just before trial.

8   I may not have them done until this weekend.

9           THE COURT:  Well, I'll need them Monday morning.

10  Surely you'll know by then if you're going to be arguing on

11  Monday afternoon.  And I'll give the government the same

12  opportunity.

13      The problem is, if there are objections, you know, we

14  don't have much time.  So everybody is going to have to plan

15  your openings with or without your slides.  So just remember

16  that.

17          Mr. Friend?

18          MR. FRIEND:  I don't anticipate we're going to use

19  any slides for opening, Your Honor.

20          THE COURT:  Mr. Curtis?

21          MR. CURTIS:  No, Your Honor.

22          THE COURT:  All right.

23      Anything else, Mr. Lynch?

24          MR. LYNCH:  No, Your Honor.

25          THE COURT:  Mr. Friend?

1          MR. FRIEND:  Your Honor, a minor point.  I think this

2     is the first time I've tried a health care case with you.

3     What is your preference when it comes to identification of

4     patients, making sure that we are sort of protecting patient

5     issues just in terms of standard?  How do you approach that?

6     I want to make sure we're conscientious of that, Your Honor.

7          THE COURT:  All right.  In the past I haven't had a

8     lot of problem because all the patients that were discussed

9     were also witnesses in the case.

10         Is that going to be the case here, do you know,

11    Mr. Lynch?

12         MR. LYNCH:  Yes.  I think -- yes, Your Honor.  I

13    think for the most part the patients that we're going to be

14    talking about are those that are connected to the substantive

15    health care fraud counts.  I think the parties have agreed in

16    sort of public filings, we've identified them just by their

17    initials.  We anticipate identifying them just by name in the

18    courtroom.  I think we can sort of seal or redact.

19         THE COURT:  We can redact the records, yes.  I think

20    it will be confusing to use initials in front of the jury.  We

21    almost have to use their names.

22         MR. LYNCH:  Yes.  And we do have the -- for the

23    direct examinations of some of the witnesses, you know, these

24    are very voluminous patient records, and for the pages that we

25    are identifying, we are redacting any sort of personal

1    information, address, phone number, Social Security number,

2    that type of thing.

3         THE COURT:  And I may tell the jury, I may give them

4    an instruction that we're going to be dealing with a lot of

5    sensitive and personal information, that we're going to do the

6    best we can to redact any unnecessary personal information,

7    but regardless that they are not to use, relay, or in any way

8    communicate personal information they may see throughout the

9    course of this trial outside this courtroom.  I think that's a

10   good idea anyway.

11       Does anybody object to that?

12            MR. CURTIS:  No, Your Honor.

13            THE COURT:  Mr. Chapman, do you object?

14            MR. CHAPMAN:  No, Your Honor.

15            THE COURT:  Okay.  I think I'll just include that.

16       You don't object, Mr. Friend?

17            MR. FRIEND:  No.

18            THE COURT:  I saw you shaking your head, Mr. Friend.

19   All right.

20       Did I answer your question?  Sometimes I don't always

21   answer directly.

22            MR. LYNCH:  I think, you know, we're going to do our

23   best to not, you know, identify a PII, but I think everyone

24   recognizes it might slip up.

25            THE COURT:  We'll take care of it.  I'll try to

1    instruct everybody.  And we'll handle it also in managing the

2    documents that are admitted into the Court record.

3        Anything else?

4        MR. LYNCH:  No, Your Honor.  Just to clarify the

5    record.  There is an exhibit related to -- Exhibits 5A and 5B

6    do reference another patient.  I'm sure there are -- you know,

7    the core of the case is about the patients that have

8    substantive counts, but there will be reference to other

9    patients as well.

10        THE COURT:  Okay.  We'll try to handle that as it

11   comes up.

12        MR. LYNCH:  Yes, Your Honor.

13        THE COURT:  Mr. Friend, did you have anything else?

14        MR. FRIEND:  Nothing further, Your Honor.

15        THE COURT:  How about you, Mr. Chapman, anything you

16   can think of?

17        MR. CHAPMAN:  Very brief issue, Your Honor.  Not an

18   issue, just highlighting a potential issue.

19      It appears, based on the government's exhibits, that

20   there's quite a liberal interpretation of the use of

21   co-conspirator statements.  Typically, in the Sixth Circuit

22   there would be an *Enright* finding at some point during trial

23   where the Court has to make a determination.  I'm sure as

24   you're aware, Your Honor, that those statements were made and

25   they were made in furtherance of the conspiracy.

1       I anticipate probably frequent and relatively early

2   objections to some statements being admitted against my client

3   for those purposes for two reasons.  First, that they may not

4   be in furtherance of any sort of conspiracy, but then also

5   that the government hasn't, you know, laid out the threshold

6   showing in total.

7       I don't know how we're going to deal with those, because

8   I'm sure that the Court may want to hear the evidence before

9   making the determination.  So I think what I'm supposed to do

10  at this juncture is to ask for an *Enright* hearing, although I

11  imagine the Court will probably say, I will make that finding

12  at some point during trial, and I wanted to make sure we

13  covered that basis.

14       THE COURT:  All right.  And thank you for raising it.

15  I think you have anticipated my ruling.

16       I'm going to provisionally admit all of the

17  co-conspirators' statements and make my *Enright* findings at

18  the appropriate time, at the conclusion of the government's

19  case, and, of course, excluding any evidence that would appear

20  to have been brought in unless those findings of the existence

21  of conspiracy are made.

22       I think there are three factors I have to decide in

23  *Enright*, the existence of a conspiracy, the role of the party

24  in the conspiracy, and also whether the acts were made in

25  furtherance of the conspiracy.  I believe that's what I have

1          to make, but I'll have to read that case again.

2              Mr. Curtis, anything?

3                  MR. CURTIS:  No, Your Honor.

4                  THE COURT:  Anything for the greater good that we

5          could talk about today?

6              Counsel, I'm just going to tell you something.  This is

7          an old building, and we have been for the past two years

8          fighting with the General Services Administration about our

9          heating and air conditioner system.  We won the battle but we

10         have lost the war.  They put in a new system and it doesn't

11         work.

12             So what I will tell you is that you should dress

13         accordingly.  It's gotten so bad up there, sometimes I've let

14         lawyers take their coats off.  It can be incredibly hot, it

15         can be incredibly cold.  So take that into consideration as

16         you choose your clothing.  I will tell the jurors the same

17         thing.  Fortunately, it's a time of year that I don't think

18         we'll have extreme weather and so we may have better luck in

19         terms of managing the climate up there, but it's pretty bad.

20             So anything else for anybody?

21             I want to thank you for your level of preparation.  This

22         has all been very helpful to me.

23             If you'd get me the briefing on the issue that we

24         discussed a few minutes ago.  And, again, just bullet point

25         style writing will be helpful to me.  I don't need anything

1    lengthy.  If you've got some cases to cite, just give me the

2    citations and I'll be happy to hear those.

3             MR. LYNCH:  And, Your Honor, we'll be responding to

4    Mr. Chapman?

5             THE COURT:  Yes, you'll be responding, and we'll let

6    Mr. Chapman take the lead on that.

7         All right.  Thank you all very much.  That concludes our

8    hearing and our business for the day.

9         (Proceedings concluded at 4:39 p.m.)

10                              - - -

11

12                   C E R T I F I C A T E

13             I, LAUREN I. GOOTEE, RMR, CRR, certify that the
     foregoing is a correct transcript from the record of
14   proceedings in the above-entitled case.

15

16   _/s/ Lauren I. Gootee                August 10, 2025
     LAUREN I. GOOTEE, RMR, CRR          Date of Certification
17   Official Court Reporter

18

19

20

21

22

23

24

25