UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 5:23-cr-9-KKC-MAS

UNITED STATES OF AMERICA                                                         PLAINTIFF

v.        UNITED STATES' SENTENCING MEMORANDUM FOR JOSÉ ALZADON

JOSÉ ALZADON, M.D.,
MICHAEL BREGENZER, AND
BARBIE VANHOOSE                                                                  DEFENDANTS

The United States hereby submits the following Sentencing Memorandum in advance of Defendant José Alzadon's, M.D. ("Alzadon") sentencing, scheduled for February 6, 2026.

As set forth below, the Government respectfully submits that: (1) pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"), Alzadon's total offense level is 26; and (2) Alzadon should receive a sentence within the Guidelines range. Additionally, Alzadon is required to serve a mandatory two-year sentence for aggravated identity theft, in violation of Title 18, United States Code, Section 1028A.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

**Indictments and Jury Verdict**

On February 2, 2023, a grand jury in the Eastern District of Kentucky returned an Indictment against Alzadon and his three co-defendants: Michael Bregenzer, Kristy Berry, and Barbie Vanhoose. The Indictment charged all four defendants with: (a) one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1); (b) 11 counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts 2–12); and (c) one count of conspiracy to unlawfully distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count 13). *See* R. 1.

On December 12, 2023, Berry pled guilty to Counts 1 and 13 of the Indictment. R. 64. Berry testified at trial against her three co-defendants, and was sentenced to six months of imprisonment to be followed by six months of home confinement on August 27, 2025. *See* R. 305.

On June 6, 2024, a grand jury returned a Superseding Indictment against Alzadon, Bregenzer, and Vanhoose, charging them with: (a) one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1); (b) 10 counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts 2–11); (c) two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 12–13); and (d) one count of conspiracy to unlawfully distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count 14). *See* R. 87. Before trial, the Government dismissed two health care fraud counts: Counts 2 and 3. *See* R. 185.

On March 20, 2025, following a three-week jury trial, Alzadon, Bregenzer, and Vanhoose were convicted of conspiracy to commit health care fraud (Count 1); all eight counts of health care fraud (Counts 4–11); and conspiracy to unlawfully distribute a controlled substance (Count 14). Alzadon and Vanhoose were also convicted of two counts of aggravated identity theft (Counts 12–13). *See* R. 226.

**Underlying Conduct**

As the Court recalls, this case related to Kentucky Addiction Centers ("KAC"), a series of addiction treatment clinics in Kentucky that treated opioid addiction in part by prescribing controlled substances such as Suboxone. Alzadon was KAC's medical director and a doctor at the practice, Bregenzer was KAC's CEO and held the largest ownership interest in KAC, Vanhoose was KAC's billing manager, and Berry was a part owner of KAC.

Defendants were convicted of defrauding health care benefit programs by billing or causing others to bill: (1) for services, specifically smoking cessation counseling sessions, that were not

2

provided; (2) for office visits at a higher level than the visit that actually occurred (i.e., "upcoding"); and (3) as though the services had been provided by Dr. Ricardo Alzadon ("Dr. Ricardo"), when in fact the services—if they had been provided at all—were rendered by Defendant Alzadon. *See* R. 87, Superseding Indictment, at ¶¶ 31–35, and 39.

In addition to the health care fraud scheme, KAC's front-desk staff maintained possession of electronic prescribing tokens that were issued to Alzadon and Dr. Ricardo. The staff used the tokens to call in prescriptions for Suboxone, a controlled substance, in the name of Alzadon and Dr. Ricardo. Such tokens can only be legally possessed and used by the Drug Enforcement Administration ("DEA")-registered medical provider to whom the token belongs. In addition, although KAC front-desk staff sent in prescriptions under Dr. Ricardo's name at Defendants' direction, it was common knowledge at KAC that Dr. Ricardo had often neither seen the patient nor prescribed the controlled substance.

**Alzadon's Involvement**

The evidence at trial showed that Alzadon was central to the underlying scheme. Specifically, the Defendants' use of Dr. Ricardo's identifiers for billing and prescribing only occurred because (a) Alzadon was ineligible to bill certain insurance providers, and (b) Alzadon sought to remain under the legal cap for the number of patients to whom he could prescribe Suboxone. Moreover, Alzadon is the only Defendant that was a medical provider—none of the other Defendants were seeing and treating patients, and therefore, Alzadon was the most knowledgeable regarding the underlying services that he actually provided and that were fraudulently billed.

As the Government detailed in its Omnibus Response in Opposition to Defendants' Post-Trial Motions (R. 298), there was ample evidence of Alzadon's active participation in the criminal

3

conduct, including: (a) several witnesses—including former employees and patients—testified that Alzadon was their doctor, even though Dr. Ricardo was listed on their medical records and prescriptions (R. 298 at 5–6); (b) Alzadon knew that treating fewer patients (i.e., consistent with his ineligibility to bill certain insurance carriers, and the cap on Suboxone patients he could treat) would result in a lower income, and he raised this with Berry (R. 298 at 6); (c) Alzadon's use of copied and pasted "cloned" notes, including in Dr. Ricardo's name and including for smoking cessation counseling that was never provided (R. 298 at 8); (d) Alzadon's brief visits with patients that were always billed at 99213 or 99214 (in the case of Medicare patients after June 2019) (R. 298 at 9); (e) Alzadon directly used—or authorized the use of—Dr. Ricardo's prescribing token to issue Suboxone to patients that Alzadon saw (R. 298 at 11–13).

Similarly, evidence at trial showed that it was common knowledge that one physician could not treat another physician's patients and bill under the other physician's name. (R. 298 at 6). Dr. Cheryl McClain even confronted Alzadon regarding billing and prescribing under Dr. Ricardo's name. (R. 298 at 7).

## GUIDELINES CALCULATION AND PRE-SENTENCE REPORT

**The Probation Office's Report and Recommendations**

On October 21, 2025, the Probation Office issued a Draft Presentence Investigation Report ("PSR") for Alzadon. The Probation Office issued a revised PSR on November 10, 2025. The revised PSR reflects the following Guidelines calculations:

| Sentencing Item | U.S.S.G. Provision | Offense Level |
|---|---|---|
| Base Offense Level Health Care Fraud | § 2B1.1(a)(2) | 6 |
| Enhancement for Loss | § 2B1.1(b)(1)(J) | +18 |
| Federal Health Care Fraud Offense (>$1m) | §§ 2B1.1(b)(7)(A), (B)(i) | +2 |
| Abuse of Position of Trust | § 3B1.3 | +2 |
| Zero-Point Offender | §§ 4C1.1(a), (b) | -2 |
| **Total Offense Level** | | **26** |
| Conviction Under 1028A | | Y |

4

The Government agrees with the Probation Office's Guidelines calculation.

**<u>Loss Amount</u>**

Consistent with the PSR, the Government submits that the appropriate loss amount for Alzadon (and for Bregenzer and Vanhoose) is **$4,883,397.03**, which results in an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J). This figure consists of:[1]

1) $722,475.00: the total billed amount to Medicare and Medicaid for all smoking cessation counseling by Alzadon and Dr. Ricardo;

2) $2,423,486.84: the total billed amount to Medicare and Medicaid for all office visits billed under code 99214 by Alzadon and Dr. Ricardo; and

3) $1,737,435.19: the total billed amount to Medicare and Medicaid for all office visits billed under code 99213 by Dr. Ricardo.

The loss amount is established by a preponderance of the evidence. *See United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). "When, like here, the losses stemming from financial frauds are difficult to quantify, the district court need only make a reasonable estimate of the loss, given the available information. Such estimates need not be determined with precision. But the district court must actually find facts, and it must do so by a preponderance of the evidence." *United States v. Siefert*, 161 F.4th 379, 400 (6th Cir. 2025) (citations and internal marks omitted) *see also United States v. Ellis*, 938 F.3d 757, 760 (6th Cir. 2019) ("Because of the difficulties often associated with attempting to calculate loss in a fraud case, the district court need only make a

---

[1] These figures are derived from: (a) GX 77a, a summary derived from GX 620 and GX 621; and (b) GX 82a, which was a demonstrative exhibit derived from GX 620 and GX 621. It was emailed to defense counsel on March 11, 2025; while the tables were not admitted into evidence, Kara McVey generally testified as to the total amount of services billed under Dr. Ricardo's name.

reasonable estimate of the loss using a preponderance of the evidence standard.") (internal citations and quotations omitted).

Furthermore, as the Sixth Circuit has recently reaffirmed, "when fraud is 'pervasive,' the entire billed amount counts toward the intended loss, and the burden then shifts to the defense to prove the specific amount by which that amount should be reduced." *United States v. Betro*, 115 F.4th 429, 454–55 (6th Cir. 2024). A finding of pervasive fraud is appropriate if the trial evidence established that the defendants' enterprise employed a scheme, such as one with a "predetermined" protocol to "to maximize profits above all else," and therefore "separating legitimate benefits from fraudulent ones [is] not reasonably practicable." *Id*.

The Guidelines define loss as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b) n.(A). In health care fraud cases, "the aggregate dollar amount of fraudulent bills submitted to the government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e. is evidence sufficient to establish the amount of the intended loss, if not rebutted." U.S.S.G. § 2B1.1 cmt. n.3(E)(viii); *United States v. Campbell*, 135 F.4th 376, 396–97 (6th Cir. 2025) (affirming the use of intended loss for purposes of sentencing in health care fraud cases).

Here, the Government respectfully submits a conservative calculation of the loss amount that resolves multiple areas of potential ambiguity in Defendants' favor. *Cf. Siefert*, 161 F.4th at 401 (affirming loss amount that accorded a more "generous" credit to a defendant that was extrapolated from trial evidence).

***First***, a finding of pervasive fraud is appropriate here. Defendants routinely billed in the name of a doctor that did not see the patients, billed for services that were not rendered, and kept such poor cut-and-pasted medical records that it is difficult to determine whether—or to what

6

extent—any billing was legitimate. Defendants engaged in fixed billing—without individualizing billing to a particular patient—to maximize profits, and likewise based billing on patients' health care coverage, including billing Medicare for more expensive services, to maximize profits. Therefore, because of Defendant's actions, it is difficult to separate legitimate benefits (for example, any office visit performed by Alzadon in which he actually provided services of the billed level of complexity) from fraudulent ones. Given the appropriateness of this finding, the default position on loss should be that Defendants are liable for the full loss amount for all billing associated with Dr. Ricardo and all office visit billing under Alzadon, and much of the billing improperly billed under other providers' NPI numbers, such as the smoking cessation counseling sessions billed under Dr. McClain's and Tiffany Wright's names that they testified that they did not provide. The burden is on Defendants to rebut this default position.

**Second**, despite the appropriateness of applying this higher loss amount based on the pervasive fraud, the Government adopts a more conservative approach. It calculates the loss amount using only three CPT codes—smoking cessation counseling (99406), level three office visits (99213), and level four office visits (99214). In reaching its loss amount, the Government excludes any loss caused by KAC's practice, as proven at trial, of unnecessary or unnecessarily lengthy counseling sessions, and all of the ancillary services for which KAC billed each time a patient visited KAC, such as breathalyzer tests. Again, testimony at trial and the finding of pervasive fraud supports including all services billed under Dr. Ricardo's name and NPI in the loss amount, but because the gravamen of the Government's case focused on these three codes (i.e., 99406, 99213, and 99214), the Government has limited its loss calculation to those three billing codes and to Alzadon and Dr. Ricardo.

***Third***, the Government has only included loss between October 2017 and December 2020, which is the date range for the health care fraud conspiracy. The Government is nonetheless aware that Defendants billed Medicare and Medicaid for smoking cessation and for office visits coded as 99213 and 99214 after December 2020, including both billing under Alzadon's name and some billing under Dr. Ricardo's name in early 2021, and such billing could be included in the loss calculation as relevant conduct. U.S.S.G. § 1B1.3.

***Fourth***, the Government excluded from its loss calculation level three office visits (99213) billed under Alzadon's name. The evidence at trial showed that medical services billed by KAC under Dr. Ricardo's name were actually performed by Alzadon, to the extent they were performed at all. The evidence further showed that patients did not receive smoking cessation counseling, or the more complex level four office visits denoted by a 99214 billing code. However, the Government recognizes some testimony at trial could support the conclusion that some of the office visits conducted by Alzadon might have been properly billed as level three (99213) visits, although none of the documentation reviewed during trial supported such billing. Therefore, the Government has been conservative in its loss calculation by excluding the amount that KAC billed for level three office visits performed by Alzadon, and only including level three office visits billed under Dr. Ricardo's name.

The Government applied the above approach as a means of expeditiously and reasonably estimating the loss amount. If Defendants object to this approach or seek further discounts, the Government reserves the right to abandon the above approach and provide further calculations—for example, related to relevant conduct or the full $6.45 million billed to Medicare and Medicaid under Dr. Ricardo's name—that provide a greater degree of precision and granularity to the loss amount figures.

**Abuse of Trust**

The Government respectfully submits that, consistent with the PSR, Alzadon's Guidelines warrant a two-level increase for abuse of a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense, pursuant to U.S.S.G. § 3B1.3. The Sixth Circuit has held that health care providers "occupy a position of trust with respect to both public and private insurance companies if they exercise professional or managerial discretion in treating patients and in billing for those treatments," where that discretion helps to facilitate the crime. *United States v. Hodge*, 259 F.3d 549, 556 (6th Cir. 2001); *see also United States v. Bryant*, 849 F. App'x 565, 574 (6th Cir. 2021) ("Bryant held a position of trust with the [Ohio Medicaid Program] and abused that position by submitting fraudulent claims for services that were never performed or services that were not performed as billed."); *United States v. Fata*, 650 F. App'x 260, 263 (6th Cir. 2016) ("Fata also occupied a position of trust vis-à-vis the insurers—both public and private—that he billed for fraudulent services."); § 3B1.3, cmt. n.4 ("'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, **doctors**, accountants, chemists, and demolition experts.") (emphasis added).

Here, Alzadon occupied a position of trust with respect to Kentucky Medicaid and Medicare. He abused that trust by repeatedly billing, or causing others to bill, for (1) services in his father's name when he (Alzadon) saw the patient, (2) services that were not provided, and (3) office visits that were lengthier and more complex—and thus more expensive—than what was actually provided to patients.

9

**Aggravated Identity Theft Conviction**

As noted in the PSR, because Alzadon was convicted of aggravated identity theft under Counts 12 and 13, a two-year consecutive sentence of imprisonment is to be imposed. 18 U.S.C. § 1028A(a)(1); U.S.S.G. § 2B1.6(a).

## ANALYSIS OF 3553(a) FACTORS

**Introduction**

The federal statute governing sentencing requires district courts to take the applicable Guidelines range into consideration when imposing a sentence, along with other sentencing factors enumerated by Congress. *See* 18 U.S.C. § 3553; *United States v. Booker*, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). When the Court determines a sentence, "the Guidelines are the starting point and the initial benchmark." *United States v. Peebles*, 624 F.3d 344, 347 (6th Cir. 2010).

Once the Court calculates a defendant's Guidelines range, it must then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence recommended by the Probation Office and the parties. *Peebles*, 624 F.3d at 347. These factors include, among others: (a) the nature and circumstances of a defendant's offense and his history and characteristics; and (b) the need for the sentence contemplated to, among other things: (i) reflect the seriousness of the offense; (ii) promote respect for the law and provide just punishment for the offense; (iii) afford adequate deterrence to criminal conduct; and (iv) protect the public from further crimes of the defendant.

The Section 3553(a) factors support a Guidelines-range sentence for Alzadon of 63–78 months (plus 24 months) in custody. Such a sentence would be "sufficient, but not greater than

necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a), discussed further below.

**Nature and Circumstances of the Offenses**

Alzadon's conduct is serious. He exploited and defrauded government-funded health care benefit programs that were intended to help vulnerable patients. Alzadon did so by using his father's NPI and DEA registration number, which allowed him to maintain a high-patient volume and collect payment on a per-patient basis. R. 252 at 2774:16–2774:23. Moreover, while the evidence was excluded from trial after Bregenzer's argument, *see* R. 144, 145, and 189, the Government and Alzadon agree that Alzadon was previously disciplined for practicing medicine in his father's name at Irvington Hospital—roughly twenty years prior to the conduct at issue in this case. See R. 145 (filing from Alzadon noting that he "does not object to the admission" of the Irvington hospital conduct). Instead of learning from this incident, Alzadon continued to practice medicine in his father's name when it was convenient for him.

Alzadon's conduct was clearly wrong. KAC staff and medical providers alike confirmed that treating another physician's patients—and billing under the other physician's name—was wrong. *See* R. 298, at 5, n.5. Dr. McClain confronted Alzadon regarding billing and prescribing under Dr. Ricardo's name, and quit because of her objections to KAC's practices. R. 298 at 7. Alzadon billing under Dr. Ricardo's name was also contrary to the terms Alzadon promised to adhere to when he enrolled with Medicare and Kentucky Medicaid. *See*, *e.g.*, R. 256 at 3193:22–3194:16; R. 256 at 3331:11–3332:4.

At bottom, Alzadon participated in—and benefited from—government health care reimbursement systems based on trust. But Alzadon's disregard for those taxpayer-funded systems

11

of trust not only erodes their integrity, but also consumed significant resources to uncover, investigate, and prosecute.

**History and Characteristics of Alzadon**

Per the PSR, Alzadon had a strong upbringing, including a positive relationship with his parents. PSR at ¶ 83. He received advanced educational degrees, including at some of the country's most pre-eminent institutions.

Despite Alzadon's privilege and upbringing, he chose to break the law and exploit government-funded health care programs. And while the Government acknowledges Alzadon's role as a caretaker for his ailing mother, the Government respectfully submits that that: (1) under U.S.S.G. § 5H1.6, "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted"; and (2) the Probation Office considered these circumstances and determined that a departure was not warranted. PSR at ¶ 111.

Accordingly, Alzadon's history and characteristics favor the imposition of a custodial, Guidelines-range sentence.

**Deterrence, Promoting Respect for the Law, and Punishing Alzadon for His Crime**

A Guidelines-range sentence is appropriate for the seriousness of Alzadon's criminal conduct and justly punishes him for that conduct. *See* 18 U.S.C. § 3553(a)(2)(A). It will also deter others from engaging in similar illegal conduct. 18 U.S.C. § 3553(a)(2)(B) (requiring district court judges to impose a sentence that affords adequate deterrence, both specific and general). In sentencing crimes which are more "rational, cool, and calculated" rather than "sudden crimes of passion or opportunity," a central consideration is the need for general deterrence. *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014).[2] Fraudulent billing by health care providers remains

---

[2] As stated by the drafters of 18 U.S.C. § 3553(a), general deterrence is particularly important for

12

a significant problem throughout the United States. Accordingly, general deterrence should be a primary consideration here. The requested sentence shows others, especially those in positions of power, that lying for profit in medical billing is not worth the risk of incarceration. *See United States v. Barbara*, 683 F.2d 164, 167 (6th Cir. 1982) (holding it was well within the district court judge's discretion to consider societal retribution and the general deterrence factors as the most important in sentencing the defendant).

The requested sentence is also sufficient to promote respect for the law. Alzadon disregarded multiple warnings, from Irvington Hospital, and then from Wendy Fletcher and Dr. McClain, and his conviction and sentence should show that compliance with the law that he willfully disregarded is paramount.

**Avoiding Unwarranted Sentencing Disparities**

The recommended sentence, which is within the Guidelines range, best serves "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Sentencing within the Guidelines range avoids "creat[ing] a potential disparity in sentence for those convicted of [the same crime] in [one state], and across the country, based on little, if anything, more than the luck of which judge is assigned to a particular case." *United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007). Indeed, one of the central reasons for creating the Guidelines was "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *Musgrave*, 761 F.3d at 609.

---

white collar criminals to dissuade actors that small fines or low sentences can be dismissed as simply a "cost of doing business." S. Rep. No. 98–225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259.

## RESTITUTION, FORFEITURE, AND OTHER MATTERS

**Restitution**

Based on the paid amounts associated with each of the above three categories (and consistent with the PSR), the total restitution amount collectively owed by Alzadon, Bregenzer, and Vanhoose is $812,881.09, which includes $556,033.21 to Kentucky Medicaid and $256,847.88 to Medicare. The Government respectfully suggests that liability for restitution should be joint and several between the Defendants.

**Forfeiture**

The Government respectfully submits that Alzadon's forfeiture amount should be $155,520. Evidence at trial established that Alzadon was paid approximately $30 per patient visit, and received over $300,000 per year in salary. *See* GX 217; R. 252 at 2774:16—2774:23. Based on the Government's analysis of the Medicare and Medicaid claims data (i.e., GX 620 and GX 621, respectively), Alzadon falsely billed 5,184 level 4 visits during the conspiracy period.[3] Thus, without accounting for any other false billings, the $30 that Alzadon would have received for each of those 5,184 patient encounters (i.e., $155,520) is subject to forfeiture.

**Special Assessment**

Per 18 U.S.C. § 3013, a special assessment of $1,200 is to be assessed against Alzadon.

**Supervised Release**

Because Alzadon was convicted of a Class C felony, the Government is requesting a three-year term of supervised release. The Government respectfully suggests that Alzadon's persistent fraudulent conduct, despite multiple warnings, warrants a three-year term of supervised release.

---

[3] These 5,184 visits were part of the Government's restitution calculation.

14

**CONCLUSION**

For the foregoing reasons, the Government respectfully recommends that this Court: (1) sentence Alzadon to a term of imprisonment consistent with the Guidelines range, plus 24 months for his conviction for aggravated identity theft; (2) order a special assessment of $1,200; (3) impose a forfeiture judgment of $155,520; and (4) require Alzadon to satisfy his restitution obligation of $812,881.09.

    Respectfully submitted,

    PAUL MCCAFFREY
    First Assistant U.S. Attorney

    LORINDA LARYEA
    CHIEF, FRAUD SECTION

    */s/ Sarah E. Edwards*
    Sarah E. Edwards
    Dermot W. Lynch
    Abdus Samad Pardesi
    Trial Attorneys
    Fraud Section, Criminal Division

**CERTIFICATE OF SERVICE**

On January 30, 2026, I electronically filed the foregoing through the ECF system, which will send the notice of electronic filing to all counsel of record.

/s/ *Sarah E. Edwards*
Trial Attorney
