UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CRIMINAL ACTION 23-CR-00009-KKC

UNITED STATES OF AMERICA                                                    PLAINTIFF,

V.                         **SENTENCING MEMORANDUM**

JOSE ALZADON, M.D.                                                          DEFENDANT.

\* \* \* \* \* \* \* \* \*

    Dr. Jose Alzadon started a clinic with the best of intentions, with an individual with whom he was in a long-term relationship. Dr. Alzadon hoped that his clinic would be able to help people with addiction, and that it would be a stable way for him to finish his career in medicine. Within a few years, control of the business had been completely taken from him, his father had fallen ill and passed away, and his long-time partner was married to another individual and was actively involved in litigation to prevent Dr. Alzadon from continuing his medical career with another business venture.

    The Defendant understands the severity of this conviction, and that his conduct did not meet the standards required by federal law. The analysis of the factors set forth in § 3553 reflect that a below-guideline sentence is sufficient, but

not greater than necessary, in the case at bar. In support of this request, the Defendant notes as follows.

### I.  PROCEDURAL BACKGROUND

On February 2, 2023, a grand jury in Lexington returned an Indictment against Alzadon and his three co-defendants: Michael Bregenzer, Kristy Berry, and Barbie Vanhoose. The indictment stemmed from the Defendants' involvement in Kentucky Addiction Centers (KAC). The Indictment charged all four defendants with: (a) one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1); (b) 11 counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts 2–12); and (c) one count of conspiracy to unlawfully distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count 13). [*See* R. 1, *Indictment*, PageID# 1-15].

The Government subsequently obtained a Superseding Indictment against Alzadon, Bregenzer, and Vanhoose,[1] charging them with: (a) one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1); (b) 10 counts of health care fraud, in violation of 18 U.S.C. § 1347 (Counts 2–11); (c) two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 12–13); and (d) one count of conspiracy to unlawfully distribute a controlled

---

[1] Co-Defendant Kristy Berry entered a guilty plea on December 12, 2023, and thus was not named in the Superseding Indictment. [R. 64, *Plea Agreement*, PageID# 196-208].

substance, in violation of 21 U.S.C. § 846 (Count 14). [*See* R. 87, *Superseding Indictment*, PageID# 262-278]. Before trial, the Government dismissed two health care fraud counts: Counts 2 and 3. [*See* R. 184, *Government Motion to Dismiss*, PageID# 1150-51; R. 185, *Order on Motion to Dismiss*, PageID# 1153].

A three-week jury trial commenced on March 3, 2025. [R. 200, *Minute Entry – Jury Trial Day 1*, PageID# 1522]. During the jury trial, the Government called over twenty witnesses, and introduced a significant number of exhibits regarding the activities of KAC. [R. 232, *Witness & Exhibit List*, PageID# 1646-54]. The jury convicted Dr. Alzadon on all counts that were tried. [R. 226, *Jury Verdict*, PageID# 1623]. The matter now comes before the Court for final sentencing.

## II.  UNRESOLVED OBJECTIONS

There are no unresolved objections to be addressed at sentencing.

## III.  ANALYSIS OF 18 U.S.C. § 3553 FACTORS

The Defendant was convicted following a jury trial. The analysis of the factors set forth in 18 U.S.C. § 3553 reflects that a sentence below the applicable guideline range is "sufficient, but not greater than necessary" to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a).

### (1)  Nature and Circumstances of the Offense

The Court is well aware of the facts that were presented during the trial of this case. Perhaps unsurprisingly, the Defendant differs with the United States regarding

the centrality of Dr. Alzadon to the conduct that occurred at KAC, as well as his motivations for participating therein. Dr. Alzadon started a small practice following his exit from Highlands Regional Medical Center.[2] Dr. Alzadon was a contracted physician with KAC, and was paid $30.00 per patient encounter. A true and accurate copy of Dr. Alzadon's contract is attached hereto as *Exhibit A*. This payment was regardless of what codes were billed. His father, Ricardo Alzadon, was also a contract physician, who was paid per patient encounter.

Billing at KAC was a very centralized operation, designed to optimize profits for the owners of the company. The smoking cessation code is indicative of the manner in which KAC operated once co-Defendant Bregenzer and his team became involved with KAC. Per the testimony of Kristy Berry, when she and Dr. Alzadon were first involved in the business, they were not using the smoking cessation code. "That was a code that Mike and Trouper had come up with that we could use." [R. 252, *Testimony of Kristy Berry - Transcript – Trial Day 5,* Page ID# 2643]. Ownership clearly attempted to create distance between itself and these billing practices, as illustrated by texts between Berry and Bregenzer where he indicated "its going to be problematic for us that we knew there was an issue and didn't address it. And it continued. That's what will get us. Hard to just blame Barbie." A true and accurate copy of Government's Trial Exhibit 475 is attached hereto as *Exhibit B*.

---

[2] Further details regarding Dr. Alzadon's background are included *infra*.

4

The Court no doubt recalls the infamous billing sheet kept by the front desk, introduced as Government Exhibit 263, with a list of codes to be utilized for each patient. An exhibit introduced by the Government at trial is particularly instructive of the manner in which KAC ownership worked to maximize its billing. A true and accurate copy of Government's Trial Exhibit 459 is attached hereto as *Exhibit C*. This exhibit reflects the sort of discussions involving ownership and high-level employees of KAC, in their quest to determine how to maximize profits. These sorts of texts did not include Dr. Alzadon, as he was not involved in making decisions for KAC regarding its overall billing practices. [R. 252, *Testimony of Kristy Berry – Trial Transcript Day 5*, PageID# 2660].

Emails throughout the time frame of the charged conduct indicate that Dr. Alzadon was not involved in coding decisions, but that these decisions were made on an organization-wide basis. A September 2019 email from Barbie Vanhoose to front office staff, as well as Kristy Wireman (Berry) is instructive, insofar as it lists four codes that should be charged, and specifically notes 99214 "for returning patients that are Medicare." A true and accurate copy of this email is attached hereto as *Exhibit D*.

KAC engaged in these billing practices for multiple providers, not just Dr. Alzadon. For example, during Dr. McClain's brief period at KAC, she indicated that her billing for visits was coded at 99214, whether she believed that applied or not.

5

Dr. McClain testified that her concern was that "no matter what service I felt was appropriate, a Level IV was going to be sent through utilizing my name and NPI number." [R. 245, *Testimony of Dr. Cheryl McClain – Trial Transcript Day 3*, PageID# 2092-93]. Copies of the billing done for Dr. McClain was introduced during trial as Exhibits 57a and 57b. Tiffany Wright, longtime nurse practitioner at KAC was also billed for smoking cessation. Government Trial Exhibit 58a reflects 2,915 billed patient encounters for 99406 Smoking Cessation Codes. A true and accurate copy of Government Trial Exhibit 58a is attached hereto as *Exhibit E.*

It is also noteworthy that KAC's policy regarding tokens, and who would maintain the tokens, applied to all providers, not just Dr. Alzadon. It was not until after he left KAC, and after the federal investigation became abundantly clear, that KAC changed its token policy to require the providers to maintain their tokens. A true and accurate copy of email sent to providers and staff

KAC often attempted to make its employees and providers feel as if the company was operating within the bounds of the law. A primary example of the manner in which Dr. Alzadon believed that they were being advised as to the legality of their actions arose in connection with the "chart locking" issue. Kristy Berry and Trouper, in consultation with KAC's counsel, prepared and disseminated affidavits to the providers at KAC to sign related to the alleged errors that caused charts to remain open. The providers signed these affidavits at the behest of Kristy Berry and

ownership. The affidavits specifically noted that when made aware of the problem "[t]he clinic immediately sought the advice of our legal counsel regarding the matter" and this included preparing affidavits for providers to sign. True and accurate copies of the *Affidavits of Jose and Ricardo Alzadon* are attached hereto as *Exhibit F*.[3] Kristy Berry's October 2021 text to Dr. Alzadon is indicative of her representations to him throughout their time at KAC, when she said "[T]he Feds only care about illegal activity and I know that we aren't doing anything illegal."

(2) **History and Characteristics of the Defendant**

Dr. Alzadon provided a detailed addendum to the PSR in this case involving his background and his relationship with his father. Part of the background of this case, which did not appear before the jury, was Dr. Alzadon's history at Irvington Hospital in New Jersey as well as Highlands Hospital in Prestonsburg. The Irvington incident which resulted in a suspension for Dr. Alzadon involved his father, who was Chief of Thoracic Surgery, allowing Dr. Alzadon to perform thoracic surgical privileges which he was not credentialed. A copy of correspondence from the Chairman of Surgery is attached hereto as *Exhibit G*.[4] The letter notes that "Dr.

---

[3] In order to avoid unnecessary cluttering within the record, affidavits signed by other providers are not attached hereto. The discovery in this matter reflects that other KAC providers signed these affidavits. *See e.g. Affidavit of S.B.* KY0635537; *Affidavit of S.D.* KY0635540.

[4] The name of the patient in this Exhibit who is not involved in the present case, is redacted. For several following exhibits, patient names are redacted if they are not witnesses involved in this case.

7

Ricardo Alzadon does not see anything wrong with asking his son Dr. Wes Alzadon to see patients in his behalf." *Exhibit G* at pg. 1. The hospital suspended Dr. Alzadon for seven days, but upon further review, determined not to impose any further sanctions, as he had been "in consultation with a thoracic surgeon and had discussed the case prior to the procedure. Likewise, the patient involved did well and the quality of patient care was not jeopardized." *See*, *Exhibit H Letter from President, Medical Staff of Irvington Hospital*. As noted in the PSR, the hospital subsequently settled out of court with Dr. Alzadon after this incident. Dr. Alzadon has also attached hereto a letter from a physician at the University of Kentucky who reviewed a patient, the transfer of whom was part of the problem that Dr. Alzadon encountered with Highlands Hospital. *See*, *Exhibit I*, *Letter from UK Physician*.

Kristy Berry testified that she and Dr. Alzadon started New Age Vitality Clinic (NAVC) in approximately 2011-12. [R. 252, *Transcript – Trial Day 5*, PageID# 2653-54]. It started as a cash operation, because they could not submit anything to insurance at that time. [*Id.*]. Once the practice morphed into KAC, Berry operated as sort of a "managing partner" as the other owners were located in Texas. [*Id.* at PageID# 2655]. Dr. Alzadon was not an owner of KAC or NAVC during the time frame of the indictment. [*Id.* at PageID# 2658]. Kristy Berry indicated that she and Dr. Alzadon had good intentions when they started KAC. [R. 252, *Transcript – Trial Day 5*, PageID# 2644].

8

Dr. McClain testified at trial testified that Dr. Alzadon seemed open to trying to make the changes that she suggested at KAC. [R. 245, *Testimony of Dr. Cheryl McClain – Trial Transcript Day 3* at PageID# 2123]. She further testified that when she observed Dr. Alzadon with the patients he was "[V]ery well liked. Very personable, absolutely. There was evidence that he cared about the patient." [*Id.* at PageID# 2115]. Evidence of how Dr. Alzadon was able to positively impact his patients is further borne out by the statement of a former patient, and his family member, attached hereto as **Sealed Exhibit L**, which is provided under seal to preserve the patient privacy of the individual involved.

During trial, witnesses testified regarding Dr. Alzadon attempting to get employees extra time off to deal with the stress of their jobs. Though not relevant to the trial, during at least one instance, Dr. Alzadon saved a patient who had fallen in the parking lot and required medical attention while awaiting the arrival of paramedics. A true and accurate copy of the "incident report" prepared by KAC is attached hereto as <u>Exhibit J</u>.

However, witnesses also testified that Kristy Berry (Wireman) exerted a great deal of control over Dr. Alzadon. One former employee noted that she and "other employees heard Wireman threaten Dr. J. Alzadon about losing his ability to practice if he didn't adhere to her business practices." *Statement of K.G.* [DOJ_KAC_000000348]. This is consistent with testimony and statements of

9

numerous other employees of KAC. Kristy Berry was in charge of local operations for KAC, and did not tolerate dissension from employees. Once Dr. Alzadon left KAC, Kristy Berry and Mike Bregenzer followed through on their threats, and initiated suit against him when he attempted to open up another clinic. A true and accurate copy of the lawsuit filed by KAC against Dr. Alzadon is attached hereto as *Exhibit K*.

The letters in support filed for Dr. Alzadon say a great deal about his personality and positive impact on the lives of those around him. Dr. Alzadon also has fully supported and cared for his aging mother in the past year, particularly since her cancer diagnosis. Dr. Alzadon provides essentially around-the-clock care for her, including for some very serious medical conditions. Specific information regarding this medical care is attached as **Sealed Exhibit M** due to the sensitive nature of her medical conditions.

Dr. Alzadon notes that the ongoing medical condition for his mother, and her full time care needs, warrant the possible consideration of a delayed reporting date and/or potential home incarceration while she remains under his care.

### (3) Need to Avoid Unwarranted Sentencing Disparities

A federal sentence must also seek to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The Sixth Circuit has held "this factor

concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct." United States v. Mitchell, 681 F.3d 867, 883 (6th Cir. 2012) (emphasis in original).  Table III-1 below reflects the national sentencing statistics for offenses similar to that for which the Defendant has been convicted.

TABLE III-1

<b>Fiscal Year 2024 Statistics (Primary Guideline 2B1.1)</b>



Data from USSC Interactive Data Analyzer (last visited January 26, 2026).[5] The filter utilized for this data, as set forth in footnote below, includes all national cases, where the defendant has a criminal history category of I, and college education or more.

Based upon the overall analysis of the § 3553 factors, the statistics reflect above reflect that Dr. Alzadon should be among the nearly 90% of offenders who receive a sentence between 0-60 months. These statistics do not, of course, take into account the fact that he is facing additional, consecutive time for the convictions under 18 U.S.C. § 1028A.[6]

### (4) Need to Protect the Public

The United States Sentencing Commission notes that only 19.9% of criminal history category I offenders are reconvicted for a new crime after being released into

---

[5] The figure includes the 1,097 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of probation only are included here as zero months.
**FILTER:**
Fiscal Year: 2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: College graduate or more; Crime Type: All; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: Exclude Career Offenders

[6] While circumstances most certainly exist where a within Guidelines sentence may be "greater than necessary" under § 3553, it is not under this factor, as the Sixth Circuit has noted that a sentence within the Guidelines does not create "unwarranted sentencing disparities." *See* United States v. Bailey, 27 F.4th 1210, 1215-16 (6th Cir. 2022) *citing* United States v. Swafford, 639 F.3d 265, 270 (6th Cir. 2011).

the community on probation or after completing supervised release. U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016). The same study reflects that only 17.4% of offenders who have zero criminal history points are actually reconvicted of another offense. Appendix A-2. Further, the Defendant has been compliant with the terms of his pretrial release during the lengthy period of time this case has been pending.

The Defendant's background and letters in support all strongly indicate that the need to protect the public should not be a factor weighing in favor of a harsh punishment in this case.

### (5)     Promote Respect for Law/Deterrence

Without a doubt, the Defendant is suffering major consequences as a result of a felony conviction including the loss of income and loss of important civil rights. When determining the sentence under § 3553, however, the collateral consequences of the conviction itself are not considered as a part of the sentence. *See* United States v. Bistline, 665 F.3d 758, 766-67 (6th Cir. 2012).

When considering what direct consequences of the sentence will satisfy the criteria set forth in § 3553, the Defendant would again point to his background, employment history and the numerous letters in support that he has received. Certainly from an individual standpoint, the "message" regarding the need to avoid

future criminal activity has been received loud and clear by the Defendant. This would apply with equal vigor to those of similar backgrounds of the Defendant.

### IV. CONCLUSION

The Defendant, Jose Alazadon, M.D., submits that a below-guideline sentence will be sufficient, but not greater than necessary to accomplish the purposes set forth in 18 U.S.C. § 3553.

This the 3rd day of February, 2026.

/s/ Noah R. Friend<br>
Noah R. Friend Law Firm, PLLC<br>
P.O. Box 310<br>
London, KY 40741<br>
606-369-7030 [Phone]<br>
502-716-6158 [Fax]<br>
noah@friendlawfirm.com<br>
COUNSEL FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of February, 2026, a true and correct copy of the foregoing was electronically filed with the Court using the CM/ECF system, which sent notification to all counsel of record herein.

/s/ Noah R. Friend
Noah R. Friend