Filed          21-CI-00479     11/24/2021          Martha M. Miller, Clark Circuit Clerk

NOT ORIGINAL DOCUMENT
02/09/2023 10:25:05 AM
92209

COMMONWEALTH OF KENTUCKY
CLARK CIRCUIT COURT
DIVISION I
CASE NO 21-CI-00479

*ELECTRONICALLY FILED*

KENTUCKY ADDICTION CENTERS, LLC                                PLAINTIFF

VS.

JOSE ALZADON                                                   DEFENDANT

    Serve:  Dr. Jose Alzadon
    522 Washington Street
    Paintsville, Kentucky 41240
    **SERVE VIA CERTIFIED MAIL**

## VERIFIED COMPLAINT

Comes now Plaintiff, Kentucky Addition Centers, LLC ("KAC"), by counsel, for its Verified Complaint against Dr. Jose Alzadon ("Alzadon"), states as follows:

### PARTIES, JURISDICTION AND VENUE

1.    KAC is incorporated as a Kentucky limited liability company. KAC's corporate headquarters are located at 2620 Homecoming, Leander, Texas 78641. KAC operates various licensed Behavioral Health Services Organization and Alcohol and Other Drug Treatment facilities in Kentucky with numerous facilities throughout the Commonwealth. KAC provides a broad array of drug treatment services to patients who are for drug addiction treatment. KAC maintains a facility in Winchester, Kentucky located at 625 Tech Drive, Winchester, Kentucky 40391.

2.    Upon information and belief, Alzadon is a resident and citizen of the Commonwealth of Kentucky, whose last known address is 522 Washington Street, Paintsville, Kentucky 41240. Alzadon entered into a Physician's Services Agreement ("Agreement") on December 11, 2017 with KAC to provide physician services to KAC patients at various KAC

Filed 21-CI-00479 11/24/2021 Martha M. Miller, Clark Circuit Clerk

NOT ORIGINAL DOCUMENT
02/09/2023 10:25:05 AM
92209

locations including KAC's facility in Winchester, Kentucky. (*See* Physicians Service Agreement, attached as Exhibit A) In addition, Alzadon has performed services at KAC as its Medical Director. KAC terminated the Agreement on October 25, 2021.

3. Defendant Alzadon is subject to the personal jurisdiction of this Court as he resides in and/or is conducting business in the Commonwealth of Kentucky.

4. Jurisdiction is proper in this Court pursuant to KRS 23A.010 and 24A.170 as the amount in controversy exceeds the sum of five thousand dollars ($5,000) exclusive of interest and costs and includes an actual controversy between the parties.

5. Further, the Agreement provides that Alzadon and KAC "irrevocably accepts and submits to the sole and exclusive jurisdiction of each of the aforesaid courts in person, generally and unconditionally with respect to any action, suit, or proceeding brought by it or against it by the other party." (Exhibit A, ¶ 20)

6. Clark County, Kentucky is the appropriate venue for this lawsuit because Alzadon agreed that any lawsuit concerning the enforcement of the subject agreement "must be brought solely and exclusively in state or federal courts located in Winchester, Kentucky." (*Id.*)

## FACTUAL BACKGROUND

7. On December 11, 2017, Alzadon began working at KAC as a contracted physician at the Winchester and Paintsville facilities. Alzadon and KAC executed a Physician Services Agreement ("Agreement") (attached as Exhibit A) and a Non-Disclosure, Confidentiality & Non-Circumvention Agreement ("Non-Disclosure Agreement") (attached as Exhibit B).

### A. Physician Services Agreement.

8. The Agreement commenced on the Effective Date of December 11, 2017, and provides that the term of the contract "shall automatically renew upon the same terms and

Filed 21-CI-00479 11/24/2021 Martha M. Miller, Clark Circuit Clerk

COM : 000002 of 000016

conditions for additional one-year terms ("Renewal Terms") unless either party provides the other with written notice of its intent not to renew at least ninety (90) days prior to the expiration of the then current Term." (Exhibit A, ¶ 6)

9. The Agreement required Alzadon to "provide mutually agreeable medical addiction and recovery healthcare services including, but not limited to, consultations, evaluations, treatment, laboratory test ordering, and medication prescribing as may be appropriate and necessary in the professional judgment of the Physician, and related administrative services and supervision of midlevel providers…." (Exhibit A, ¶ 1)

10. For this, Alzadon was initially compensated thirty dollars ($30) per patient encounter. (Exhibit A, Compensation to Exhibit A)

11. Alzadon and KAC renewed his contract and the terms of the contract in 2019. (Exhibit A) This Agreement contains a Covenant Not to Compete, Interfere or Solicit and the Confidentiality provisions, to which Alzadon is bound. (Exhibit A, ¶¶ 11-12)

12. The Agreement's Covenant Not to Compete, Interfere or Solicit provided for the following restrictive covenants:

> "Physician agrees that during the Term of this Agreement and for a period of two (2) years after its termination, cancellation or natural expiration, Physician will not on Physician's own behalf or on behalf of any other person, organization or entity, individually or collectively, in any fashion, form or manner, attempt to interfere with the business of KAC, either directly or indirectly, in any manner including, but not limited to: (a) interacting with KAC's patients or potential patients in an attempt to disrupt or discontinue, or solicit, entice, or induce to discontinue any facet of their current or future relationship with KAC; (b) interacting with KAC's employees, agents, contractors and/or representatives in an attempt to induce, solicit or entice them to discontinue or limit their relationship with KAC; (c) interacting with any facility or location where KAC or any other Physician of KAC does business in attempt to induce, solicit, or entice such facility to disruptor discontinue any facet of its relationship with KAC or such other Physician of KAC; and/or (d)interacting with any person, physician, physician group or entity so as to divulge any information about KAC's business. During the Term of this Agreement Physician shall not, unless otherwise agreed upon between the parties in writing, undertake professional medical services (e.g. locum tenens, consulting, etc.) for any third party KAC competitor or have

any substantial interest in or employment or contractual relationship with any KAC competitor person or entity within a twenty-five (25) mile radius of any facility or location where KAC does business. Physician acknowledges that the restrictions contained in this Section are reasonable and necessary for the reasonable protection of the business interests of KAC. Physician further acknowledges that KAC would not have entered into this Agreement, but for these restrictions which have been deemed necessary to protect a legitimate business interest. However, if any court of appropriate jurisdiction shall determine that such provisions are unenforceable as to scope, territory or period of time, such provisions shall remain in force for such modified scope, territory, or period of time as the court may determine to be reasonable under the circumstances. If any provision is held invalid, void or unenforceable, the remaining provisions shall continue in full force and effect without being impaired or invalidated. This provision may be enforced through injunctive relief by any court of competent jurisdiction; however, the issuance of an injunction shall not in any manner prevent KAC from seeking compensatory damages in addition thereto, including reasonable attorney's fees, if such damages result from a violation of these provisions. This Section shall survive termination or expiration of this Agreement." (Exhibit A, ¶11)

13. Thus, by the plain letter and reasonable language of the Agreement, Alzadon was prohibited during the term of the Agreement and for two (2) years after its termination from directly or indirectly, for himself or for and through another, form soliciting KAC patients or employees, disrupting KAC business, or divulging nay KAC information.

14. Paragraph 12 of the Agreement also contains a restriction on the use of Confidential information by KAC.

"Physician acknowledges and agrees that it shall become privy to certain proprietary and/or confidential information of KAC, and Physician agrees it shall maintain confidentiality of all proprietary and/or confidential information related to KAC's operations, including, without limitation: policies, procedures, business practices, strategic plans, patient lists, financial information, contracts with physicians, third parties and payers, and any other information which may reasonably be deemed to be confidential in nature." (Exhibit A, ¶ 12)

15. The Confidentiality provision is an ongoing obligation of Alzadon,

"The parties agree that the terms and conditions of this Agreement shall remain confidential. Neither party shall distribute this Agreement or any part thereof or reveal any of the terms of this Agreement to parties other than their legal and financial advisors, and as necessary, their employees and agents, or as may be otherwise required by law. This Section shall survive termination or expiration of this Agreement." (Id.)

16. Alzadon's Agreement defines "confidential information of KAC" as:

"all proprietary and/or confidential information related to KAC's operations, including, without limitation: policies, procedures, business practices, strategic plans, patient lists, financial information, contracts with physicians, third parties and payers, and any other information which may reasonably be deemed to be confidential in nature." (Exhibit A, 2019 ¶ 12)

17. The Agreement also requires Alzadon to act in a manner consistent with KAC policies and procedures. (Exhibit A ¶ 1) KAC's handbook contains several policies and procedures applicable to Alzadon, which require him to return KAC property and maintain the confidentiality of KAC's information. KAC Handbook, Section 5, General Standards of Conduct requires KAC personnel, including Alzadon through the Agreement, to abide by certain workplace conduct. (See Section 5, pg. 24 of KAC's Handbook, attached as Exhibit C) This includes:

   a. Prohibition against stealing, removing or defacing Kentucky Addiction Centers property or a co-worker's property, and/or disclosure of confidential information. (Section 5-1(2));

   b. Prohibition against accessing, or attempting to access to, another employee's computer systems without appropriate authorization (Section 5-3);

   c. Prohibition on copying, removing, using, or disclosing confidential information (Section 5-11);

   d. Prohibition on improper use of KAC equipment or intellectual property (Section 5-13);

   e. Requiring the return of KAC property, including "all of the Company's Confidential Information upon separation." (Section 5-21).

### B. Non-Disclosure, Confidentiality & Non-Circumvention Agreement.

18. Contemporaneous with his Physician Services Agreement, Alzadon and KAC also executed a Non-Disclosure, Confidentiality & Non-Circumvention Agreement (Non-Disclosure Agreement) on December 11, 2017. The Non-Disclosure Agreement is attached hereto as Exhibit B).

19. The Non-Disclosure Agreement contains certain restrictive covenants which prohibit Alzadon from disclosing or using KAC Confidential Information.

20. The Non-Disclosure Agreement defines Confidential Information in Paragraph 2, and includes "any and all information disclosed or made available to [Alzadon] by or on behalf of [KAC]…." It provides examples that include financial information, employment information, information or specifications regarding current or proposed medical and diagnostic laboratory products or services, customer information. (Exhibit B, ¶ 2)

21. Paragraph 3 of the Non-Disclosure Agreement prohibits the disclosure or use of proprietary information, including any and all trade secrets to compete either directly or indirectly with KAC. (Exhibit B, ¶ 3)

22. Paragraph 4 of the Non-Disclosure Agreement prohibits the use of any Confidential Information "to the benefit of any individual or entity (including [Alzadon]) or to circumvent, compete, or otherwise to the detriment of the Disclosing Party." (Exhibit B, ¶ 4)

23. Paragraph 5 of the Non-Disclosure Agreement requires Alzadon to treat Confidential Information with care, and prohibits the disclosure of Confidential Information even if required by law, or by legal, administrative or regulatory process unless notice is first provided to KAC to give it an opportunity to object or seek an appropriate protective order. (Exhibit B, ¶ 5)

24. Paragraph 6 of the Non-Disclosure Agreement states that all Confidential Information remains the property of KAC, and further requires Alzadon to return all documents containing Confidential Information to KAC upon the end of the project, which in this case was his Physician's Service Agreement. (Exhibit B, ¶ 6)

25. While contracted with KAC, Alzadon had access to and was entrusted with not only the confidential information of KAC's patients but also the confidential, proprietary and trade secret information owned by KAC.

26. In or about April 2019, Alzadon was formally named the Medical Director of KAC's Winchester and Paintsville locations. He was compensated in the amount of $1,500 per month for his role as Medical Director. Alzadon was presented with a new Physician's Services Agreement to execute which acknowledged this new role and compensation, and also would increase his pay, but he never signed the new agreement. Nonetheless, KAC still increased the compensation it paid Alzadon for physician services to $40.00 per patient encounter, and paid him for his role as Medical Director.

**C. KAC Provides Notice of Termination on October 25, 2021, Alzadon's Failure to Return Confidential Information, and Alzadon's Solicitation of KAC Employees and Patients.**

27. On October 25, 2021, KAC provided notice of termination of Alzadon's contract. (Notice of Termination, attached as Exhibit D) Per the Agreement, the termination is set to take effect ninety (90) days after the date of the Notice of Termination. In the Notice of Termination, KAC reminded Alzadon of his obligations of non-solicitation, non-compete, and confidentiality provisions.

28. On October 26, 2021, counsel for KAC advised Alzadon's attorney of his obligations to return any and all KAC property or information in his possession immediately. (*See* Email from M. Denham to A. Adkins, attached as Exhibit E) KAC Chief Strategy Officer and Head of Human Resources ("CSO-HHR") Trouper Krueger also advised Alzadon directly of his obligations to return property of KAC in Alzadon's possession. (*See* Email from T. Krueger to J. Alzadon, attached as Exhibit F) Alzadon did not comply with these requests to return property

immediately. Instead, a week later, his counsel informed KAC's counsel that the KAC issued laptop computer in Alzadon's possession had been left at the law firm of Richardson, Baber, and Williamson in Mt. Sterling, Kentucky. Upon information and belief from information provided by a representative of that law firm, Alzadon is not believed to have ever had any present or past attorney/client relationship with Richardson, Barber and Williamson. It is unknown why he left the laptop at their offices instead of returning it to KAC. KAC personnel picked up the computer on November 1, 2021 from Richardson, Barber and Williamson. No other information or property was returned to KAC.

29. On November 16, 2021 KAC was made aware that Alzadon was in possession of and/or had improperly accessed proprietary and confidential information of KAC. Specifically, Alzadon admitted to Kristy Wireman that he and his associate, Jennifer Carr, possessed confidential information on their personal electronic devices. (*See* Affidavit of Kristy Wireman, ¶¶ 10, 12, attached as Exhibit G)

30. Carr has been associated with Alzadon through a weight loss clinic he opened, which was within the 25-mile radius limitation in his non-compete called Optimal Care and Recovery, LLC. Alzadon previously informed KAC personnel that he only intended to use this clinic as a weight loss clinic, but upon information and belief, he planned to use this as a competing drug treatment clinic while soliciting KAC employees and patients to join him. Carr is believed to have been assisting Alzadon in getting credentialed with third-party payors so Alzadon can bill insurance for the treatment of patients at the competing clinic.

31. In addition, Alzadon stated to Mareeka Rice that he was in possession of certain KAC material and voluntarily allowed her to take a video of a text message string on his personal iPhone. This text message string between Alzadon and Carr showed Carr texting Alzadon a screen

shot of an internal and confidential KAC email from CSO-HHR Trouper Krueger, which was intended only for KAC staff and personnel, and was sent to ensure staff were in compliance with certain federal and state laws. This email contains sensitive and confidential KAC information. A copy is not attached hereto given the confidential nature of the email.

32. On November 17, 2021, at the direction of KAC, counsel for KAC alerted counsel for Alzadon of Alzadon's impermissible retention of KAC property and information and demanded the immediate return of information and the immediate preservation of evidence. (*See* Ltr. from M. Denham to A. Adkins, attached as Exhibit H) The letter also demanded that Alzadon cease and desist from soliciting any and all KAC patients or employees in violation of the Agreement. (*Id.*) KAC CSO-HHR Krueger sent the letter directly to Alzadon via email.

33. Counsel for Alzadon responded that she would speak with her client. (*See* Emails to and from M. Denham and A. Adkins, November 17, 2021, attached hereto as Exhibit I) No response has been forthcoming. Given the opportunity, Alzadon has not denied he is in possession of KAC's proprietary and confidential information. He has also not denied that he is soliciting KAC employees and/or patients. (*Id.*)

34. Alzadon's and his associate Carr's access of and possession of this confidential information violates the Agreement (Exhibit A, ¶ 12), the Non-Disclosure Agreement (Exhibit B, ¶¶ 2-7), the KAC Handbook (Exhibit C, Section 5), and additional statutory provisions and common law doctrines as described herein.

35. Alzadon is also in breach of the Covenant Not to Compete, Interfere or Solicit. (See Exhibit A, ¶ 12)

36. While contracted by KAC Alzadon frequently solicited KAC staff to open a competing clinic with him. (*See* Affidavit of Jimmy W. Arnett, attached as Exhibit J) He made

these solicitations to Clinical Services Director Jimmy Arnett and to other counselors and therapists working under Mr. Arnett's supervision. (*Id.*) He stated to Mr. Arnett that his goal was to compete with KAC and harm its owners because he believed that they had stolen the business from him. (*Id.*)

37. Since his termination, it has been reported to Mr. Arnett that Alzadon has solicited numerous patients of KAC, informed them that they can come to see him when he opens a competing clinic. (Exhibit J, ¶¶ 11-12, 14-16) These solicitations interfere with, disrupt, and attempt to cause the patients to discontinue services with KAC, all for the financial benefit of Alzadon. It also disrupts the patient's treatment with new providers at KAC who worked to ensure continuity of care for the patients.

38. Due to his failure to respond to KAC's demand that he return its confidential and proprietary information, and to preserve any evidence in his possession, it is unknown the extent of the information in his possession. However, based on his own statements to KAC personnel and the information he has voluntarily showed to KAC personnel, it is clear that he has this information in his possession.

## COUNT I
### BREACH OF CONTRACT – PHYSICIAN SERVICES AGREEMENT

39. KAC hereby incorporates the preceding paragraphs as if fully restated herein.

40. Alzadon executed the Agreement which contained a Covenant Not to Compete, Interfere or Solicit and Confidentiality provisions upon renewal of his contract with KAC. (See Exhibit A)

41. Alzadon also violated the Agreement by not returning and/or destroying KAC confidential information, Alzadon impermissibly saved KAC documentation on his personal computer.

42. Alzadon has violated the terms of the Agreement by disclosing KAC's proprietary and confidential information that have not become available in the public domain.

43. Alzadon has violated the Agreement by his intentions to and beginning the process of opening a directly competing clinic of KAC prior to the termination of his Agreement.

44. Alzadon has violated the terms of the Agreement by soliciting KAC's employees in an attempt to disrupt the business of KAC.

45. Alzadon has violated the terms of the Agreement by soliciting KAC's patients for his competing clinic in an attempt to disrupt the business of KAC.

46. KAC has and will continue to suffer harm as a result of Alzadon's violations of his Agreements with KAC.

47. KAC is entitled to injunctive relief, an equitable extension of the restrictive covenants, damages and its costs and attorney fees for Alzadon's violations of the above restrictive covenants.

**COUNT II**
**BREACH OF CONTRACT – NON-DISCLOSURE, CONFIDENTIALITY, AND NON-CIRCUMENTION AGREEMENT**

1. KAC hereby incorporates the preceding paragraphs as if fully restated herein.

2. Alzadon has breached the Non-Disclousre, Confidenitality, and Non-Circumvention Agreement by failing to return confidential information to KAC upon its demand, intentionally providing confidential information to third-parties without KAC's consent, and/or accessing KAC's confidential information without its consent;

3. These actions are in violation of The Non-Disclosure Agreement, including but not limited to paragraphs 2, 3, 4, 5, 6, and 7, as fully described therein.

### COUNT III
### CIVIL CONVERSION

4. KAC hereby incorporates the preceding paragraphs as if fully restated herein.

5. Alzadon converted proprietary and confidential information and records that belonged to KAC.

6. KAC had possession of the converted property and the right to possess the property at the time of the conversion.

7. Alzadon exercised dominion and control over the converted property after his termination and KAC's request to return the property and in a manner which denied KAC its right to use and enjoy the property and which was instead used for Alzadon's own benefit.

8. Alzadon intended to interfere with KAC's possession and use of the property.

9. KAC has and will continue to suffer harm as a result of Defendants' conversion of its property.

### COUNT IV
### VIOLATIONS OF THE KENTUCKY UNIFORM TRADE SECRETS ACT, KRS 365.880

10. KAC hereby incorporates the preceding paragraphs as if fully restated herein.

11. The proprietary customer and corporate information and records that Alzadon misappropriated from KAC is protectable trade secrets under the Kentucky Uniform Trade Secrets Act, KRS 365.880, *et seq.*, in that they (1) derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other

12

persons who can obtain economic value from their disclosure or use, and (2) are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

12. Alzadon has accessed KAC's trade secrets without KAC's express or implied consent.

13. Defendants acquired knowledge of the trade secrets by improper means.

14. At the time of disclosure or use, Alzadon knew or had reason to know that his knowledge of the trade secrets was (a) derived from or through a person that had utilized improper means to acquire it; (b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (c) derived from or through a person who owed a duty to the person seeking relieve to maintain its secrecy.

15. KAC has and will continue to suffer harm as a result of Alzadon's trade secret misappropriation.

16. Alzadon's misappropriations were willful and malicious such that attorney fees are appropriate under KRS 365.886.

### COUNT V
### TORTIOUS INTERFERENCE

17. KAC hereby incorporates the preceding paragraphs as if fully restated herein.

18. Alzadon has intentionally, and without privilege, interfered with KAC's existing and prospective relationships with patients seeking treatment.

19. Moreover, Alzadon has intentionally, and without privilege, interfered with KAC's contractual relationships with its employees and staff.

20. KAC has and will continue to suffer harm as a result of Alzadon's tortious interference.

## COUNT VII
## ATTORNEYS FEES

21. KAC incorporates the preceding paragraphs as if fully restated herein.

22. The Agreement provides that KAC may seek "compensatory damages in addition thereto, including reasonable attorney's fees" for violations of the Covenant Not to Compete, Interfere or Solicit.

23. Alzadon, through the actions described herein, including soliciting KAC employees, KAC patients, and refusing to return KAC's confidential information, has cause KAC damages, including expending money on attorneys fees in excess of the jurisdictional limits.

## COUNT VIII
## INJUNCTIVE RELIEF

1. KAC incorporates the preceding paragraphs as if fully restated herein.

2. KAC is entitled to injunctive relief in the form of a restraining order, temporary injunction, and permanent injunction to protect form any and prospective all harm which would be caused by Alzadon soliciting its employees, patients, or using its confidential information in violation of the Agreement, the Non-Disclosure Agreement, and common law. *See Maupin v. Stansbury*, 575 S.W.2d 695 (Ky. App., 1978)

3. Without a temporary and permanent injunction, KAC will suffer immediate and irreparable harm.

4. In addition, the disruption of services to KAC's patients will cause them to suffer immediate and irreparable harm as Alzadon's continued solicitation will cause disruption in their counseling services and interruptions to the continuity of care.

5. Alzadon agreed that violations of the Agreement and Non-Disclosure Agreement would cause immediate and irreparable harm warranting injunctive relief. (Exhibit A, at ¶ 11); (Exhibit B, at ¶ 8).

6. A balance of the equities weigh in favor of issuing a restraining order, temporary injunction, and permanent injunction.

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter an order for:

   a. a Judgment on all claims in favor of the Plaintiff against Defendant;

   b. a restraining order, temporary injunction, and permanent injunctive prohibiting Alzadon from soliciting KAC employees and patients, and accessing and/or disclosing KAC confidential and proprietary information; requiring the return of any and all KAC confidential and proprietary information immediately; requiring the preservation of evidence, including evidence stored on electronic devices; and allowing for expedited discovery pending any hearing on its Motion for a Temporary Injunction;

   c. Plaintiff's reasonable attorneys' fees;

   d. any and all costs incurred by Plaintiff;

   e. compensatory damages;

   f. punitive damages;

   g. any and all other relief to which it may be entitled.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Mitchel T. Denham*
Mitchel T. Denham (#89815)
Madison Gamble (#98855)
Dressman Benzinger LaVelle PSC
321 West Main Street Suite 2100
Louisville, KY 40202
Phone: (502) 572-2500
Fax: (502) 572-2503
Email: mdenham@dbllaw.com
*Attorney for Plaintiff,*
*Kentucky Addiction Centers, LLC*