1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
- - -

UNITED STATES OF AMERICA,      : Docket No. 23-cr-9
                               :
                    Plaintiff, : Lexington, Kentucky
                               : Friday, February 6, 2026
                               : 1:00 p.m.
v.                             :
                               :
JOSE ALZADON,                  :
                               :
                    Defendant. :

- - -
TRANSCRIPT OF SENTENCING
BEFORE KAREN K. CALDWELL
UNITED STATES DISTRICT COURT JUDGE
- - -

APPEARANCES:

For the United States:      SARAH ELIZABETH EDWARDS, ESQ.
                            U.S. Department of Justice
                            1400 New York Avenue, N.W.
                            Washington, D.C.  20005


For the Defendant:          NOAH ROBERT FRIEND, ESQ.
                            Noah R. Friend Law Firm, PLLC
                            PO Box 341
                            Versailles, Kentucky 40383


Court Reporter:             LAUREN I. GOOTEE, RMR, CRR
                            Official Court Reporter
                            101 Barr Street
                            Lexington, Kentucky 40507
                            (859) 469-7459




     Proceedings recorded by mechanical stenography, transcript produced by computer.

2

(Proceedings commenced in open court at 1:00 p.m.)

THE COURT:  Good afternoon.

Would the clerk please call the matter to come before the Court.

COURTROOM DEPUTY:  Yes, Your Honor.

Lexington Criminal Action Number 23-9, the United States of America versus Jose Alzadon, called for sentencing.

THE COURT:  Would the United States make its appearance for the record.

MS. EDWARDS:  Good afternoon, Your Honor.  Sara Edwards for the United States.  And with me at counsel table is Milton Goff of the Department of Labor.

THE COURT:  Counsel.  Mr. Goff.

For the defense.

MR. FRIEND:  Good afternoon, Your Honor.  Noah Friend on behalf of Dr. Jose Alzadon, who is seated to my right.

THE COURT:  Counsel.  Mr. Alzadon.

This matter is called on for a sentencing hearing.

Has the United States received and reviewed the presentence report and all the related materials?

MS. EDWARDS:  We have, Your Honor.

THE COURT:  I didn't see any objections.  Are there any you would bring to my attention today?

MS. EDWARDS:  There are no objections from the United States.

3

THE COURT:  Thank you.

Mr. Friend, have you and Mr. Alzadon received and reviewed all of the presentence materials, including the report?

MR. FRIEND:  We have, Your Honor.

THE COURT:  I see one objection that is unresolved on behalf of the defendant.  Are there any others you would bring to my attention today?

MR. FRIEND:  No, Your Honor.  Per our sentencing memorandum, I believe we noted no unresolved objections.  I think that one could be considered as withdrawn.

THE COURT:  All right.  So you have no objections?

MR. FRIEND:  No objections, Your Honor.

THE COURT:  Very well.  Okay.  I thought that you had withdrawn it, but I wanted to be sure.  Thank you very much.

Accordingly, the Court will adopt the factual findings and the advisory guidelines that are set forth in the presentence report.  The Court determines that the appropriate advisory guideline calculation for this defendant is from 63 to 78 months on Counts 1, 4, and 11, 24 months on Counts 12 and 13 to run consecutive to all other counts, and 48 months on Count 14, arriving at a total offense level of 26 and a criminal history category of I.

Are there motions from the United States, Ms. Edwards?

MS. EDWARDS:  I believe the only motion, Your Honor,

4

is, you granted our preliminary order of forfeiture, and we would ask that it be incorporated into the final judgment today.

THE COURT:  I'll do that.

I have received a sentencing memorandum from the defendant and from the United States.  I have received a number of letters in support of this defendant, which I have read and will give appropriate weight.

Mr. Alzadon, I'm going to hear from the lawyers here in just a moment, but before I do, is there anything you would like to say to aid the Court in determining its sentence?  You can just remain seated because I can hear you better if you speak into the microphone.

THE DEFENDANT:  Yes, Your Honor.  If I may approach the podium?

THE COURT:  You may.

THE DEFENDANT:  I want to first thank Your Honor for your patience and your fairness in presiding over this trial. I also want to thank the government for bringing these matters to light, and my attorney Noah Friend for his guidance throughout this process and for helping me understand the legal ramifications of what I did and what I failed to do.

I come before the Court to express my remorse and accept responsibility for my failures with the clear understanding that the charges of my conviction represent violations of the

5

law.  While I have struggled personally to reconcile this outcome with my own understanding of my intentions at the time, I fully respect the Court's judgment and accept the legal consequences that flow from it.

Being a physician is a privilege that carries an extraordinary burden of responsibility.  It demands the highest standards of integrity, not only clinically, but legally and ethically as well.  I once believed that providing excellent patient care was sufficient, but I now understand it was not.  Good intentions do not excuse legal noncompliance, and misunderstanding the law does not absolve accountability or responsibility.

I recognize that in the eyes of the law, my father and I were two separate individuals, but in practice and spirit, we worked as one.  Whether in the operating room, the emergency room, or the office, we worked together with a shared sense of responsibility and purpose.  He has been my mentor that has shaped both my personal and professional life.  I regret that I failed to appreciate how firmly the law required separation and formality.  I should have been more vigilant, more cognizant of the laws, and more proactive in ensuring compliance.

I deeply regret the consequences of my failures, and I am sincerely sorry to everyone affected, my family, our patients, and our staff, especially Kristy and Barbie who assumed

6

responsibilities they should not have had to bear.  Those responsibilities and failures were mine.

I'm especially sorry to my parents.  My father passed away knowing we were under investigation.  I had hoped to honor him by giving him the title of honorary medical director, but instead, in his final days, I disappointed him.

Excuse me, Your Honor.

THE COURT:  Take your time.  There's some water there and some tissues.

THE DEFENDANT:  That regret will remain with me for the rest of my life.  Excuse me.

THE COURT:  Take your time.

THE DEFENDANT:  When I entered addiction medicine, my purpose was to treat people with dignity and compassion.  I remain grateful for our team and for the lives that were transformed through their efforts.  At our best, we were the collaborative coordinated practice I had envisioned when we began.

When KAC assumed control of the practice, I placed my trust in them, believing they had the expertise and legal oversight to ensure compliance.  They retained legal counsel from the former deputy attorney general of Kentucky, and we received a site visit from the executive director of the office of Drug Control Policy.  At that time, I genuinely believed we were operating appropriately and contributing to a

7

meaningful purpose that was larger than any of us. I understand now, in retrospect, that reliance on others did not relieve me of my own responsibility.

When it became clear that we were not in compliance with the law, I attempted to address the issue, and I regret that I was unable to resolve my differences with the company in terms of my working relationship with the nurse practitioners in a way that would have ensured both collaboration and legal compliance. Ultimately, it was my responsibility that the practice met all legal requirements. I regret that I did not do more sooner or insist on clearer safeguards. That failure rests with me.

This conviction has been profoundly humbling. I've lost my practice, my professional standing, and my reputation in the community I served, yet no loss compares to the loss of my father.

Your Honor, as you consider my sentence, I respectfully ask that you see not only the legal facts but also the human side of the story, because I believe the good we achieved with our patients far outweighed our mistakes and deficiencies. While I accept the Court's judgment and the responsibility imposed by law, I hope the Court will recognize that the care we provided reflected our commitment to our patients even though that commitment was not matched by proper legal standards.

8

I do not deny my failures and I accept the consequences that follow from them, and I am deeply sorry for the harm caused by my failures.

In closing, I ask for your mercy and for compassion regarding my mother for whom I am the primary caregiver. In my father's last days, this investigation weighed heavily on both of us, and I regret allowing my distress of this trial to distract me from caring for him as fully as I should have. I do not want to make the same mistake again with my mother. If it is within the Court's discretion, I respectfully request the opportunity to remain with my mother as her caregiver during her remaining time and serve my sentence thereafter.

I thank you, Your Honor, for giving me this opportunity to express my heart to the Court.

THE COURT: Thank you very much.

Would you like for me to file a copy of Dr. Alzadon's statement into the record?

MR. FRIEND: Yes, Your Honor.

THE COURT: All right. I'll do that. You can submit it.

MR. FRIEND: Would you like me to tender that at this time?

THE COURT: Would you please. Mr. Friend.

MR. FRIEND: Your Honor, I think through

9

Dr. Alzadon's statement a moment ago, it certainly brings in a very personal aspect of this case for him.  We mentioned, of course, in our sentencing memorandum sort of the position that he was in as his practice started with Kristy Berry while they were in a relationship.  His father later got involved of course.  Where he has ended up several years later is certainly not where he imagined that he would be when this started.

Not to restate arguments contained within the sentencing memorandum -- of course the Court is very familiar with the facts of this case.  You had a lengthy trial, a lot of exhibits.  I know the Court has had an opportunity to review that -- but I think reviewing a few things that came out both from the trial and subsequently is important.

Number one, I believe that while evidence had the title of medical director behind Dr. Alzadon through the period of the conspiracy, I think it's pretty clear that billing, coding decisions, a lot of those decisions were top-down decisions that were being made out of Texas.  I think a very good example of what happened when providers pushed back on that is we see how quickly Dr. McClain was sort of forced out once she became involved.

And I think you can certainly tell from Dr. Alzadon's statement at this point that he wishes he had done things differently.  We will note in mitigation, not excuse,

10

certainly the personal issues that he has raised, the fact that throughout his time there he was concerned, as we noted, about the fact that he was afraid he would lose his practice if he was to try to go out.  I think the fact that KAC sued him immediately after he was terminated to keep him from opening another practice reflects that that fear was not unfounded.

And again, of course, a note about many of the coding things that occurred were occurring across the board, multiple providers.  I think the testimony at trial showed that KAC when it came to the tokens had a pretty wide policy applying to multiple providers about how those tokens would be dealt with.  Again, realizing the fact that occurred for other providers does not obviate him of legal responsibility, but again noting the nature of that.

And also the fact that the patients he was seeing for his father, his father was getting paid for those patients.  That was not something that evidence shows Dr. Alzadon was being paid for.

And another note, of course, about some mention throughout of the DEA numbers and maybe attempts to get around the DEA caps.  If I recall the exhibits, I think there were some lines there that throughout the time that this occurred, I don't believe those caps were approached or exceeded too often.  So I do not believe, at least essentially certainly

from Dr. Alzadon's standpoint, that that was any sort of intention that could be put on him.  I believe that the evidence clearly shows a lot of what was happening organization-wide was in anticipation of a potential sale to a third party, a potential sale in which Dr. Alzadon was not an owner of KAC and was not likely to benefit therefrom.

In fashioning an appropriate sentence under 3553, again, I will not restate the arguments made within the sentencing memorandum, Dr. Alzadon's statement.  I will note certainly we believe a below-guideline sentence would be appropriate.  We have seen the sentences the Court has imposed for other defendants in this case.  We realize, of course, that the sentencing disparities apply more nationwide and not case specific.

However, looking in this case, for example, the sentence for co-defendant Vanhoose, who was in charge of billing, essentially her guidelines on Counts 1, 4, and 11, I believe, would have been, based on the fact that I believe she received time served, would be in the zero to six month range if we were to look at the sentencing table.

Realizing that the guidelines, of course, create a meaningful differentiation between her and Dr. Alzadon based on his status as a doctor, that would indicate about a two-level increase over that, which, again, looking at the sentencing table would be 6 to 12 months.  So to the extent

12

that the Court decides to impose a custodial sentence on that, that would be our request for that count, understanding 24 months to follow.

Certainly unless the Court would prefer, I would reserve any argument about report date until after sentence is announced.  To the extent again that the Court is able -- again, it may be more in connection with a report date.  The medical treatment that he is providing for his mom is essential for her and is essentially a full-time job for him, so to the extent that the Court would consider whether any period of time between now and a report date could be considered as home incarceration, I would add that the Court would consider whether that would be appropriate.

I will note -- I think Dr. Alzadon could confirm if the Court needed it -- that technically his mother has been in Hospice care since March of last year and is still here.  I'm attending a funeral this afternoon for someone we went to church with who was in Hospice care for eight days.  So the fact that she's been in Hospice care for 11 months I think speaks to the very close attention she's getting medically. So we would just ask the Court's consideration for that both for sentencing and report date purposes.

THE COURT:  Thank you very much.

Ms. Edwards.

MS. EDWARDS:  Thank you, Your Honor.

13

I think the sentencing may be somewhat unusual in the degree of overlap to which the government and the defendant following trial see his position in the conduct at issue.  The government does not take the position that Dr. Alzadon was in this alone or in fact that he was the leader.  We have sought a leadership enhancement for a different defendant.  But I do think that it is important just to reiterate briefly a few points from our memo that Dr. Alzadon was the gatekeeper.

None of this is possible without a physician who has made promises to Medicare and Medicaid and the DEA about the ways in which they will conduct themselves as someone with great power and responsibility to do things that most members of our society cannot.

And while we hear Dr. Alzadon's statements about his history of working with his father, we do think it is also important that it was not new to Dr. Alzadon to know that society did not see him and his father as the same physician. Nearly two decades before the conduct at issue here, he had been disciplined for performing procedures that only his father was authorized to perform.  And there are exhibits alluding to that attached to Dr. Alzadon's sentencing memorandum.

Whatever Dr. Alzadon and his father might have preferred in their practice, they knew that they essentially were not permitted to sub in and out for each other at will,

14

Your Honor, and Dr. Alzadon continued to disregard those rules, including federal law, when it was convenient for him essentially.  And out of respect for the law and to deter others from doing the same thing, we do think that significant punishment in line with the guidelines is appropriate here.

I think just two more points, one of which is factual. And I confess, I am not finding which Exhibit 77 sub exhibit it was, Your Honor, but if you will go back to the exhibits in the 77 series from trial, which were admitted into evidence by Kara McVey, one of them shows the times that Dr. Alzadon and his father together would have exceeded the 275 patient cap, which did happen regularly throughout the course of the charged conduct.  I apologize, I don't have that exact exhibit at hand.

And the last point I'd like to make is just for all the people who Dr. Alzadon may well have helped -- and the government does not deny that KAC certainly helped some people struggling with addiction even as it was committing the fraud that was the subject of this case -- but it also hurt people, and I think that they need not be forgotten today.

In particular, I am thinking of the patients who testified at this trial before Your Honor who I think it is fair to say felt mislead and confused and dismayed when they realized that their doctor maybe wasn't the doctor they thought it was.  In particular, Ms. Holly Meeks, who testified

15

that she got Suboxone at KAC but not necessarily the treatment she thought she needed, and Ashley Connor, who testified before Your Honor about a traumatic relapse that she went through that, as best we could tell from the evidence presented at trial, didn't even register with the doctor who was only spending a minute or two at a time with her.

It's a complicated situation. Society's attempts to help those who are struggling to recover from substance abuse is complicated, and in those situations we rely more than ever on the physicians and the gatekeepers to ensure that things are being done correctly. Thank you.

THE COURT: Cases like this are always hard. White collar defendants rarely have any criminal history. Unlike about 99 percent of the people who come before this Court who have nothing, nobody, and no hope, white collar defendants, and particularly this defendant, come before the Court with the privilege of education, a loving family, a profession, standing in the community, and in this particular profession a unique public trust that is still held for doctors.

And that is particularly concerning here because these people weren't careful or suspicious of Dr. Alzadon when they sought his treatment, but that kind of trust from the public allowed him to perpetuate his crimes, to charge for treatments that weren't always provided as noted, and allowed the others who were motivated only by profit to exploit the legitimate

16

treatment that he provided.

What's so sad here is that much of this crime could have not been committed but for Alzadon's compliance.  He wasn't really in it for profit, he was getting paid a salary, but he went along with people who were motivated only by money, and he knew what he had to do and he did it.  Other doctors, as Mr. Friend points out, who didn't go along, we saw what happened to them.

Also importantly here, we have general and specific deterrence.  I don't think we need to deter Dr. Alzadon from further crimes like this.  He's lost his license, his ability to commit this kind of crime.  I don't think we'll see him before this Court again.  But general deterrence is required because this is not a victimless crime.

Government programs are not piggybanks to be broken by the needy or the greedy, and these kinds of crimes strike at the heart of the publicly provided Medicare/Medicaid benefits that are so desperately needed in our society.  So really as I formulate this sentence, I'm thinking about general deterrence.

There's also the issue of promoting respect for the law. You know, lots of times we see government programs as a faceless victim.  It's just a pile of money out there.  But that pile of money is desperately needed by so many in this country, and in eastern Kentucky in particular, where people

17

are poor and they rely on these government programs.

You know, white collar crimes are very serious.  You know, people will say, oh, well, there's no violence involved, but there is a kind of violence to our society and to the common trust that we hold in public benefits that really its importance can't be overstated.  So this Court finds this to be a very, very serious crime indeed.

But again, this defendant was not motivated only by greed.  I think he was just trying to keep a job, but he went along and got along.  The other defendants could not have accomplished what they did without him.  It's just that simple.  They stood to gain, and he went along with it.

Having stated that, all of these reasons why a sentence of incarceration and a significant one is required, I do believe that justice should be tempered with some mercy in this case.  Accordingly, I am going to engage in a variance or a departure from the guidelines because I do believe that the Court can formulate a sentence that is just and that will adequately punish the defendant without the need for more.

Accordingly, it is the judgment that the defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 36 months on Counts 1, 4, and 11, 36 months on Count 14, and 24 months on Count 12, which must run consecutive to all others, for a total of 60 months.  This is a significant sentence for this defendant, in addition to the

18

fact that he will owe a substantial obligation of restitution.

Now, it's recommended to the Bureau of Prisons that the defendant have a mental health evaluation and receive any treatment that he might need.

Now, on release from prison, Mr. Alzadon, you must be placed on supervised release for a term of three years on Counts 1 and 4 through 11, one year on Counts 12 through 14, for a total term of three years.

Within 72 hours of your release from prison, you must report in person to the United States Probation Office in the district to which you're released.  The Court believes that a term of supervised release is required here because of the seriousness of this crime to provide adequate deterrence and public protection and also to ensure the payment of restitution.

Now, while you're on supervised release, you must not commit another federal, state, or local crime, and you must comply with all the standard and mandatory conditions adopted by this Court.  You must not possess a firearm, destructive device, ammunition, or a dangerous weapon, and you must refrain from the unlawful use of a controlled substance.  You must submit to one drug test within 15 days of your release from prison and at least two periodic drug tests thereafter.

In addition, you must participate in drug and alcohol testing, all at the direction and discretion of the United

19

States Probation Office.  That may include any form of substance abuse testing, including urinalysis.  You must not obstruct or tamper with the drug testing mechanism, and you must not knowingly use or consume any kind of substance that would interfere with it.

You must keep the United States Probation Office informed of any employment, financial interests, or remuneration.  You must provide the probation officer with complete access to any financial information that they might request of you in a timely fashion.

Restitution in the amount of $256,847.88 is due to Medicare and $556,033.21 is due to Medicaid immediately.  Any outstanding balance owed upon commencement of incarceration must be paid in accordance with the Federal Bureau of Prisons Financial Inmate Responsibility Program.  And any amount due upon release from prison will be paid by subsequent orders of the Court.

You shall forfeit the property outlined in the forfeiture allegation.  Based on your current financial situation and the obligation of restitution, I'm not going to impose a fine.  It is further ordered that you shall pay the United States a special assessment of $1,200, which is due immediately.  I'm not going to impose interest on the restitution.

Also, I will allow the defendant to self-report, and we can talk about those issues in a moment.

20

Just in the event I didn't make it clear, the sentence of 48 months is on Counts 1 and 4 through 11 -- I think I said 1, 4, and 11 -- and 48 months on Count 14.  I think that makes it correct.

Did I get that correct, Ms. Edwards?

MS. EDWARDS:  You did, Your Honor.  I was also going to ask you to clarify.  I expect that the 24 months Your Honor imposed on Count 12, you are imposing the same on Count 13, but 12 and 13 will run concurrently?

THE COURT:  Will run concurrently and consecutive to all other counts.  I'm sorry.  I've made so many notes here that I couldn't read my own scribbles.

Do you understand, Mr. Friend?

MR. FRIEND:  Yes, Your Honor.  That seems correct.

THE COURT:  Okay.  Ms. Foright, did I get that correct?

MS. FORIGHT:  Yes, Your Honor.

THE COURT:  Thank you all very much.

Is there any legal reason sentence should not be imposed as stated, Mr. Edwards?

MS. EDWARDS:  No, Your Honor.

THE COURT:  Mr. Friend?

MR. FRIEND:  None, Your Honor.

THE COURT:  Very well.

The Court is inclined to allow the defendant to

21

self-report to the institution, but I usually require that to give the Bureau of Prisons plenty of time to get a defendant placed correctly anywhere from 60 to 90 days.  I'm not really inclined to go much beyond that, Mr. Friend, unless I have something really compelling in front of me.

MR. FRIEND:  Yes, Your Honor.  I will note, certainly our request would be -- and we're glad to file periodic status updates or something if necessary.  I was talking to the United States earlier about how to deal with, of course, the relatively sensitive matter related to Dr. Alzadon's mother, which I think it is clear based on the level of care that she needs.  And I will say certainly the family situation, if he's not there, she's going to be required to be placed into a facility.

So our suggestion, Your Honor, would be a maximum report date of six months, which is typically what Hospice's time frame is.  And I would certainly be glad to file periodic status updates with the Court.  Again, a sensitive issue, but if she was to pass away earlier than that, to then have his report date set something like 30 days thereafter.

Again, she has far exceeded medical expectations to this point, but certainly I know of some changes to the guidelines recently.  It's not specifically sentence related rather than report date related, but this appears to be a situation where his report date would have a direct and material impact on the

22

health of a third party, so I think a longer period would be warranted, if the Court is open to that.

THE COURT:  Very well.

Ms. Edwards, what says the United States?

MS. EDWARDS:  The United States says that if the Court is inclined to grant a report date up to 180 days, recognizing as Mr. Friend says that is the typical time period anticipated for Hospice, the United States will not object.

THE COURT:  Very well.

The Bureau of Prisons usually needs a date, but I'm only granting this length of extension.  Let me do this.  Let me give him a report date of 90 days, giving Mr. Friend the opportunity to request an extension of that 90 days.

And then I take it, Ms. Edwards, you would work with Mr. Friend for a period up to 180 days?

MS. EDWARDS:  Yes, Your Honor.

THE COURT:  All right.  Just because if -- and it's terrible to say this, but if his mother were to pass away in a couple of weeks, you don't want to prolong this any longer than you have to.  And also, the Bureau of Prisons actually does spend some time trying to get people placed correctly, and I want him to have the benefit of that.  So let's get a report date.

Kim, do you have something on a weekday at 90 days?

COURTROOM DEPUTY:  May 5th is a Tuesday.

THE COURT:  Okay.  May 5th, 2026, before 2:00 p.m. at the institution designated by the United States Bureau of Prisons.

Dr. Alzadon, let me tell you something about this.  It's really important.  All of your current conditions will continue to apply because you'll be on bond.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Failure to report for service of sentence is a separate crime for which you could be prosecuted.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So you need to be where you're supposed to be when you're supposed to be there.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Particularly in view of the substantial variance that you have received in this case.

Do you understand that?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  I'm going to ask the clerk of court to give you some information regarding your right to appeal this case.  I'm going to give you a copy of this advice for your records.  I'll ask you and Mr. Friend to sign a copy of the advice just to show that it was given to you here in open court.  And, of course, Mr. Friend is going to keep you

24

well advised.

Madam Clerk.

(The form entitled "Court's Advice of Right to Appeal" was read aloud in open court by the clerk, and said form was signed by the defendant.)

THE COURT: The record will reflect that the defendant and his counsel have executed the acknowledgment form. It will be filed in the record.

Ms. Edwards, is there anything else for the United States?

MS. EDWARDS: If I may raise two technical things, Your Honor.

THE COURT: You may.

MS. EDWARDS: The first is for the record. As we did with the previous defendant, Dr. Alzadon and Mr. Friend have both been given a copy of a letter from the U.S. Department of Labor that bars Dr. Alzadon from participating in certain employment related to ERISA going forward, and we'd like the record to so reflect that.

THE COURT: Yes.

MS. EDWARDS: I apologize if Your Honor said this and I missed it, but I did just want to clarify if you intend Dr. Alzadon's restitution to be joint and several with the other defendants in this case.

THE COURT: I think that's appropriate. I don't

25

think it could be collected from all of them, but we'll make it joint and several.

Is there any objection to that, Mr. Friend?

MR. FRIEND: No, Your Honor.

THE COURT: I think what I'll do too is we said he has to comply with the law, but I'm also going to impose the condition of supervised release that he comply with the Department of Labor.

Is that basically debarment? Is that what you'd call that?

MS. EDWARDS: Essentially, yes, Your Honor.

THE COURT: Is there any objection to that?

MR. FRIEND: No, that seems appropriate, Judge.

THE COURT: Very well. We'll add those to the conditions.

MS. EDWARDS: Thank you, Your Honor.

THE COURT: Anything else, Mr. Friend?

MR. FRIEND: Nothing else, Your Honor. Thank you.

THE COURT: Thank you all very much. I hope you all travel safely home. I don't know what's happening outside. Thank you all for being here. That concludes this hearing.

(Proceedings concluded at 1:37 p.m.)

- - -

26

C E R T I F I C A T E

I, LAUREN I. GOOTEE, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.


_/s/ Lauren I. Gootee___                    March 27, 2026____
LAUREN I. GOOTEE, RMR, CRR                  Date of Certification
Official Court Reporter